Guy VANDER JAGT, et al., Appellants,

v.

Thomas P. O'NEILL, Jr., et al.

No. 81-2150.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 19, 1982.

Judgment Issued Dec. 23, 1982.

Opinions Issued Feb. 4, 1983.

William E. Dannemeyer, Fullerton, Cal., of the bar of the Supreme Court of California by special leave of the Court pro hac vice and James F. Schoener, Birmingham, Mich., for appellants.

Stanley M. Brand, Washington, D.C., Gen. Counsel to the Clerk, U.S. House of Representatives with whom Steven R. Ross, Washington, D.C., Asst. Counsel to the Clerk, U.S. House of Representatives was on brief, for appellees.

Before BORK, Circuit Judge, ROBB, Senior Circuit Judge and JAMES F. GOR-

DON,* Senior District Judge for the Western District of Kentucky.

Opinion for the Court filed by Senior District Judge JAMES F. GORDON.

Concurring opinion filed by Circuit Judge BORK.

JAMES F. GORDON, Senior District Judge: ·

Fourteen Republican Members of the House of Representatives have sued the House Democratic leadership, the Democratic Steering and Policy Committee, and the Democratic Caucus.[1] The Republicans contend that the Democrats systematically discriminated against them by providing them with fewer seats on House committees and subcommittees than they are proportionally owed. The district court dismissed the complaint, *Vander Jagt v. O'Neill*, 524 F.Supp. 519 (D.D.C.1981), holding that the appellants' suit was barred by the Speech or Debate Clause and by the provision of the Constitution which confers upon the House the power "to determine the Rules of its Proceedings." Art. I, § 5, cl. 2. We affirm on somewhat different grounds.

Appellants claim that the Democrats diluted the power and influence of Republican House members, and thus the political rights of voters in Republican congressional districts as well. This happened after members of the Democratic Caucus met in the weeks before the opening of the 97th Congress and determined the number of committee seats to be allocated to Democrats and Republicans. That allocation took ef-

fect when the House convened on January 5, 1981, and passed House Resolution 44 on a straight-party vote. Even though Republicans constituted 44.14% of the House and Democrats 55.86%, Republicans were given only 40% of the seats on the Budget Committee and the Appropriations Committee, only 34.29% of the Ways and Means Committee seats, and only 31.25% of the Rules Committee seats.

The Republicans say this arrangement deprived them of Fifth Amendment due process and equal protection rights, as well as First Amendment rights of association and free speech. Also the Republicans say that the Democrats violated Article I by adding the additional requirement of majority party membership to the qualifications for full House membership. Finally, the Republicans say that voters in congressional districts represented by Republicans were deprived of rights to due process and equal protection, rights to freedom of association, and rights to petition the government for redress of grievances.

In evaluating whether we have jurisdiction and also whether we should provide relief, a variety of doctrines have been presented that would lead to dismissal of this complaint. The district court held that jurisdiction was "ousted" by the Speech or Debate Clause and by the Article I provision allowing the House "to determine the Rules of its Proceedings."[2] Alternatively, our distinguished colleague, Judge Bork, urges dismissal because the Republicans lack standing. Finally, we have considered whether this suit should be dismissed fol-

---

* The Honorable James F. Gordon, United States District Court for the Western District of Kentucky, sitting by designation pursuant to 28 U.S.C. § 294(d).

1. The Republicans sue as members of the House, as members of various committees of the House, and as individual voters. They also sue as representatives of three classes: (1) the class of all Republican members of the House, (2) the class of all members of certain committees of the House, and (3) the class of all voters in congressional districts represented by Republican members. Appellees are Thomas P. O'Neill, Jr., the Speaker of the House; Jim Wright, the Majority Leader; Gillis W. Long,

Chairman of the Democratic Caucus; the Democratic Steering and Policy Committee of the House of Representatives; and, the Democratic Caucus, which consists of all Democratic members of the House of Representatives. Appellees O'Neill, Wright, and Long are sued in their various capacities as House members and Democratic leaders.

2. U.S. CONST. art. I, § 5, cl. 2 provides: "Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a Member."

lowing the approach taken in *Riegle v. Federal Open Market Committee,* 656 F.2d 873 (D.C.Cir.1981). There a senator was challenging the constitutionality of certain procedures established by the Federal Reserve Act. Judge Robb, writing in *Riegle* for a unanimous panel, rejected the arguments that the senator lacked standing, or that the case should be dismissed as nonjusticiable under the political question or ripeness doctrines. Instead, the court simply declined to grant the senator relief because it found that judicial action would improvidently interfere with the legislative process. *Riegle* relied heavily on a recent article by former Chief Judge Carl McGowan, which analyzed suits brought by congressional plaintiffs and concluded "that the best way to translate those [separation-of-powers] concerns into principled decisionmaking is through the discretion of the federal court to grant or to withhold injunctive or declaratory relief." [3]

We hold that this case should be dismissed using *Riegle*'s approach of withholding relief where prudential and separation-of-powers concerns counsel us not to exercise our judicial power. We do not think that the Speech or Debate Clause immunities are necessarily applicable in this context, nor do we think that we lack jurisdiction because of Article I. We also find that appellants do have standing. Because *Riegle* involved facts that were different from those we face, the following sections extend *Riegle*'s analysis to these circumstances.

## I. STANDING

 We turn first to the question of standing, and the suggestion that we cannot consider the Republicans' challenge because they have not alleged an injury that is judicially cognizable. The Supreme Court has indicated that in ruling on a motion to dismiss for lack of standing, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197,

2206, 45 L.Ed.2d 343 (1975). Here the Republicans have alleged that as legislators and as voters their political power has been diluted, and they have raised significant additional issues about First Amendment rights to free association and free speech. Further, they have raised a plausible claim that the Democrats have added the additional requirement of majority party membership to the qualifications for full House membership. We consider these allegations sufficient to withstand a motion to dismiss.

Judge Bork, however, makes two interrelated arguments in challenging the justiciability of the allegations that the Republicans' political power has been diluted. He suggests that the harms that the Republican legislators have allegedly suffered are insufficient to support standing, and he further contends that because those harms implicate general separation-of-powers concerns, we have additional reason to deny standing.

The initial argument revives a legal distinction discarded in *Riegle v. Federal Open Market Committee,* 656 F.2d 873 (D.C.Cir. 1981), between allegations that a legislator's vote has been "nullified" and allegations that the legislator's influence has merely been diminished. Judge Bork contends that only where there has been nullification of a legislator's vote can there be a sufficient injury to support standing; he relies in particular on *Kennedy v. Sampson,* 511 F.2d 430 (D.C.Cir.1974), *Harrington v. Bush,* 553 F.2d 190 (D.C.Cir.1977), and *Goldwater v. Carter,* 617 F.2d 697 (D.C.Cir.), *judgment vacated on other grounds,* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979). Without further discussion, we simply note that a unanimous panel of this circuit repudiated that distinction in *Riegle* after expressly considering the "doctrinal difficulties presented by an attempt to reconcile our denial of congressional standing in the *Public Citizen v. Sampson,* 379 F.Supp. 662 (D.D.C.1974), *aff'd mem.,* 515 F.2d 1018 (D.C.Cir.1975); *Harrington,* and *Reuss v. Balles,* 584 F.2d 461 (D.C.Cir.), *cert.*

**3.** McGowan, *Congressmen in Court: The New* *Plaintiffs,* 15 GA.L.REV. 241, 262 (1981).

*denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978) cases, on the one hand, with our conferral of legislator standing in the *Kennedy* and *Goldwater* cases, on the other." [4]

Judge Bork's second argument was also, we think, answered in *Riegle,* but he suggests that *Riegle*'s analysis was implicitly rejected by the Supreme Court in *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). There the Court provided its most recent formulation of the standing requirement in stating that:

> at an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 [99 S.Ct. 1601, 1608, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976).

454 U.S. at 472, 102 S.Ct. at 758. Immediately following this summary, the Court explained the standing doctrine's function: "In this manner does Art. III limit the federal judicial power 'to those disputes which confine federal courts to a role *consistent with a system of separated powers*

and which are traditionally thought to be capable of resolution through the judicial process.' *Flast v. Cohen,* [392 U.S. 83 (1968)] at 97 [88 S.Ct. 1942 at 1951, 20 L.Ed.2d 947]." *Id.* (emphasis added).

Judge Bork contends that the Court's use of the phrase "separated powers," taken together with language from other opinions over the past decade, signals that we should consider separation-of-powers issues as part of our determination whether appellants have standing. But we decline to place as much weight on the Supreme Court's language as Judge Bork does. If the Court had meant to expand its standing doctrines to make room for a whole set of analytically-unrelated theories about the roles of the separate branches of government, it could have said so. Instead, we should continue to rely on previous expressions by the Supreme Court that it does not mean to have separation-of-powers controversies resolved under the rubric of standing. As Judge Bork acknowledges, *infra* at 1179, in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the Court explicitly addressed and explicitly rejected the notion that "in terms of Article III limitations on federal court jurisdiction, the question of standing" intersects "separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government." 392 U.S. at 100–01, 88 S.Ct. at 1952–1953.

It is true that in the years following *Flast,* this circuit itself relied several times on standing principles to dismiss separation-

---

**4.** 656 F.2d at 880. It is important to recognize that even if we return to *Goldwater*'s requirements for legislator standing, (and even if we ignore appellants' other constitutional claims, as Judge Bork does), there is still another hurdle before we can dismiss this case for lack of standing. That hurdle is that we are not only dealing here with legislators suing as legislators, but also with legislators suing as voters and as representatives of the classes of all voters represented by Republicans. In that sense, appellants would seem to have strengthened their argument for judicial review by including "private plaintiffs" in their suit. *See Riegle,* 656 F.2d at 882; note 16 *supra.* For regardless of the requirements for legislators' standing, there can be no doubt that the voting

rights cases established that "complete nullification" of voting power is not necessary for citizens challenging congressional elections to acquire standing. *White v. Weiser,* 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973).

Judge Bork resolves this problem by denying standing on the grounds that "a private plaintiff's suit raises identical separation-of-powers concerns because those concerns are about the relationship of the courts to Congress," *infra* at 1184. In the following section, we discuss why we cannot accept his expansion of standing doctrines to include separation-of-powers concerns. On the other hand, simply because we grant standing does not mean that we must reach the merits of this suit, as *Riegle* thought might be necessary. *See* note 24 *supra.*

of-powers controversies. But in the aftermath of *Riegle*, it surely is now settled law in this circuit that standing doctrines will not be manipulated to resolve separation-of-powers problems.

*Riegle* followed *Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (*mem.*), where the Supreme Court vacated this circuit's en banc decision, 617 F.2d 697, which had used standing to resolve a separation-of-powers challenge. Judge Robb summarized in *Riegle* the *Goldwater* lesson:

> The Court ignored the standing concept altogether and, in separate opinions by Justices Powell and Rehnquist, neither of which gained a majority of the Court, relied upon the doctrines of ripeness and political question, respectively (citation omitted.)
>
> If, as the ultimate disposition of *Goldwater v. Carter* suggests, the Supreme Court does not believe that the standing doctrine is capable of reflecting the prudential concerns raised by congressional plaintiff suits, *this court ought not persist in the attempt to make it do so.*

656 F.2d at 880 (emphasis added).

Yet Judge Bork continues to argue that "*Riegle*'s reasoning proceeded from a false premise about the Supreme Court's view of standing." *Infra* at 1182. His insistence that we lack the power to act in this case and in other separation-of-powers disputes has considerable practical significance.

For the essence of this lawsuit is that the Democratic House leadership has successfully diluted the political power of Republican representatives, their voters, and residents of their districts. This dilution has occurred because the Democrats have disproportionately limited the Republicans' representation on congressional committees, and "a committee of Congress—in the legislative scheme of things, is for all practical purposes Congress itself." *Doe v. McMil-*

*lan,* 412 U.S. 306, 344, 93 S.Ct. 2018, 2040, 36 L.Ed.2d 912 (1973) (Rehnquist, J., concurring in part and dissenting in part). We readily acknowledge that the constitutional claims raised in this suit are different from those raised in *Nixon v. Herndon*, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927) and its progeny (the White Primary cases), or *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) and its progeny. But the significance of those cases is a lesson we cannot ignore: for many years, our nation—with surprising consensus—has relied on the judiciary to remedy longstanding flaws in the political system which impede equal participation in the governmental process.

Thus while there are compelling prudential reasons why we should not interfere in the House's distribution of committee seats, it is nevertheless critical that we do not deny our jurisdiction over the claims in this case. As long as it is conceivable that the committee system could be manipulated beyond reason, we should not abandon our constitutional obligation—our duty and not simply our province—"to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803); *United States v. Nixon,* 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974).

Courts and commentators [5] have long recognized that it is crucial to distinguish questions about whether judicial power exists, from questions about whether judicial power should be exercised. Our decision today simply recognizes that if Congress should adopt internal procedures which "ignore constitutional restraints or violate fundamental rights," it is clear that we must provide remedial action. *United States v. Ballin,* 144 U.S. 1, 12 S.Ct. 507, 36 L.Ed. 321 (1892). *Cf. Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966) (Georgia House of Representatives acted unconstitutionally when it excluded Julian Bond because of his statement criticizing the feder-

---

5. "As with many other areas of justiciability concern, in short, it would be better to forgo resort to article III and supposed limits on judicial power in favor of direct attention to the substantive and remedial problems raised by the particular case." 13 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3531, at 112 (Cum.Supp.1980). *See also* note 27 *infra.*

al government's policy in Vietnam); *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (U.S. House of Representatives acted unconstitutionally when it effectively expelled Adam Clayton Powell by a majority vote because of charges that Powell had misappropriated public funds and abused the process of the New York courts); *Kucinich v. Forbes,* 432 F.Supp. 1101 (N.D.Ohio 1977) (Cleveland City Council acted unconstitutionally when it suspended Gary Kucinich for possibly suggesting that the council president had accepted money for passage of certain legislation).

## II. THE SPEECH OR DEBATE CLAUSE[6]

The district court dismissed appellants' challenge in part because it concluded that "the actions complained of, even though they might affect plaintiffs' constitutional rights as voters and Members, are beyond the reach of this Court by virtue of the Speech and Debate Clause." 524 F.Supp. at 521 (citations omitted). The district court reasoned "that actions taken by House Members belonging to one party pursuant to decisions made by them in a caucus of that party are actions performed within the 'legitimate legislative sphere.' *See East-*

land v. United States Servicemen's Fund, 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975)." *Id.* (additional citations omitted).

Appellants argue, however, that the Clause should not be interpreted to shield the Democrats' method of allocating committee seats. The Republicans point out that the Democrats acted before the 97th Congress was sworn in, and they argue that partisan political decisions are not within the "legitimate legislative sphere." "To extend the immunities of the Constitution to a partisan political caucus and to persons not yet Members is to extend a concept far beyond its original intent."[7]

We are reluctant to define the constitutional boundaries of immunized congressional conduct if we are not compelled to do so.[8] Both the history and the Supreme Court's interpretation of the Clause indicate that it should be used to shield actions of individual legislators or their staffs who otherwise might fear civil or criminal attacks. That does not necessarily mean that legislative activities like those in this controversy should be shielded.[9] In addition, we are concerned to avoid unnecessary constitutional adjudication, especially when the

---

6. U.S. CONST. art. I, § 6, cl. 1 provides: "The Senators and Representatives shall ... and for any Speech or Debate in either House, they shall not be questioned in any other Place."

7. Brief for Appellants at 4.

8. Judge Bork reminds us *infra* at 1185, note 5, of the "Supreme Court's recently announced principle that Speech or Debate Clause issues are generally to be dealt with before the merits are reached. *Davis v. Passman,* 442 U.S. 228, 235, n. 11, 99 S.Ct. 2264, 2272 n. 11, 60 L.Ed.2d 846 (1979)." That principle is designed to protect legislators "not only from the consequences of litigation's results but also from the burden of defending themselves." *Davis,* 442 U.S. at 236 n. 11, 99 S.Ct. at 2272, quoting *Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 1427–1428, 18 L.Ed.2d 577 (1967). Because we do not reach the merits of this case, but in fact affirm the lower court's dismissal, it seems likely that we are within the spirit—if not the letter—of *Davis.* In addition, we are mindful of the Supreme Court's repeated admonitions not " 'to decide questions of a constitutional nature unless absolutely necessary to a decision of the case.' *Burton v. United States,* 196 U.S. 283, 295 [25 S.Ct. 243, 245, 49 L.Ed. 482]." *Ashwander v. Tennessee*

Valley Authority, 297 U.S. 288, 347 [56 S.Ct. 466, 483, 80 L.Ed. 688] (1936) (Brandeis, J., concurring).

9. The "Clause has been read 'broadly to effectuate its purposes,' ... and includes within its protections anything 'generally done in a session of the House by one of its members in relation to the business before it.' " *Doe v. McMillan,* 412 U.S. 306, 311, 93 S.Ct. 2018, 2024, 36 L.Ed.2d 912 (1973) (citations omitted.) Still, it is at least debatable whether the partisan organizational actions of the Democratic Caucus should be immunized as "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972). *See* Reinstein & Silverglate, *Legislative Privilege and the Separation of Powers,* 86 HARV.L.REV. 113 (1973); *The Supreme Court, 1974 Term,* 89 HARV.L.REV. 131 (1975).

essential issue here whether these "activities are casually or incidentally related to legislative affairs but [are] not a part of the legislative process itself," is extremely slippery.[10] Because our remedial discretion provides sufficient foundation for our dismissal of this suit, we decline to affirm the district court's invocation of the Speech or Debate Clause, which again might hamstring us in the future.[11]

### III. JUDICIAL REVIEW OF CONGRESSIONAL RULES OF PROCEDURE

The rules of the House limit committee membership to nominees of each party's caucus.[12] Thus, when the Republicans challenge the allocation of committee seats for being disproportionately unbalanced, they are actually challenging the system of rules the House has adopted under Art. I, § 5, cl. 2. Because "the Constitution confers upon the House the power 'to determine the Rules of its Proceedings,'" the district court found that "[t]his textual commitment of the issue to the House would oust the Court's jurisdiction, even if such jurisdiction were not more explicitly foreclosed by the Speech and Debate Clause." 524 F.Supp. at 521 (citations omitted).

The appellants argue, however, that "the Courts have the right and duty to consider the validity of [a procedural] rule in relation to other Constitutional provisions."[13] That is to say, while the district court concluded that we lack jurisdiction, the Republicans say first that we do have jurisdiction,

and then argue that the congressional structure should be held unconstitutional.

The Supreme Court in *United States v. Ballin,* 144 U.S. 1, 12 S.Ct. 507, 36 L.Ed. 321 (1892), made plain that our scope of review is broader than the district court believed. The Court expressly weighed the constitutional "validity" of a House rule involving when a sufficient quorum was present. In doing so, the Court indicated that our review of congressional rules is to be equally deferential, but no more so, than our review of most other legislative actions:

> Neither do the advantages or disadvantages, the wisdom or folly, of such a rule present any matters for judicial consideration. With the courts the question is only one of power. The Constitution empowers each house to determine its rules of proceedings. It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained. But within these limitations all matters of method are open to the determination of the house, and it is no impeachment of the rule to say that some other way would be better, more accurate or even more just.

144 U.S. at 5, 12 S.Ct. at 509.

This circuit has previously expressed its reluctance to review congressional operating rules,[14] though it has never denied its

---

**10.** The standard is quoted from *United States v. Brewster,* 408 U.S. 501, 528, 92 S.Ct. 2531, 2545, 33 L.Ed.2d 507 (1972), itself an example of awkward adjudication. *Brewster* held that a former senator could be prosecuted for being bribed to perform a legislative act, despite the immunities of the Speech or Debate Clause, because "an inquiry into the purpose of a bribe 'does not draw in question the legislative acts of the defendant member of Congress or his motives for performing them.'" 408 U.S. at 526, 92 S.Ct. at 2544 (citation omitted).

See also *Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).

**11.** See *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 509–10, n. 16, 95 S.Ct. 1813, 1824–1825, n. 16, 44 L.Ed.2d 324 (1975)

(discussing "the absolute nature of the speech or debate protection.")

**12.** H.R. Rule X, cl. 6(a)(1), *Rules of the House of Representatives,* § 701a, *reprinted in Jefferson's Manual and Rules of the House of Representatives,* H.R.Doc. No. 96–398, 96th Cong., 2d Sess. 387 (1981), provides: "The standing committees specified in clause 1 shall be elected by the House at the commencement of each Congress, from nominations submitted by the respective party caucuses."

**13.** Brief for Appellants at 13.

**14.** *See, e.g., Metzenbaum v. FERC,* 675 F.2d 1282, 1287 (D.C.Cir.1982); *Exxon Corp. v. FTC,* 589 F.2d 582, 590 (D.C.Cir.1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044

power to do so. The discomfort has been rooted in the doctrine of nonjusticiable political questions, as set forth in *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). There the Supreme Court declared that "[p]rominent on the surface of any case held to involve a political question" were such separation-of-powers concerns as whether there was "a textually demonstrable constitutional commitment of the issue to a coordinate political department." 369 U.S. at 217, 82 S.Ct. at 710. This circuit has drawn on that doctrine to reach the conclusion that Art. I, § 5, cl. 2 creates a "specific constitutional base" which requires us to "take special care to avoid intruding into a constitutionally delineated prerogative of the Legislative Branch."[15] Unfortunately, no court has ever explained what it might mean to "take special care." But it is significant that no court has ever followed *Baker v. Carr* to the extent of holding that this textual commitment alone makes these cases nonjusticiable.[16]

In fact, however, this authorization of power to Congress is not analytically different from many other constitutionally enumerated powers. So it is not evident why we must treat congressional rules with "special care," or with more than the customary deference we show other legislative enactments.[17] Because of the position taken in *Ballin,* which apparently was adopted by Justice Brandeis writing for the Supreme Court in *United States v. Smith,* 286 U.S. 6, 33, 52 S.Ct. 475, 477–478, 76 L.Ed. 954 (1932),[18] we conclude that Art. I simply means that neither we nor the Executive Branch may tell Congress what rules it must adopt. Article I does not alter our judicial responsibility to say what rules Congress may not adopt because of constitutional infirmity.

We recognize that this raises some doubt about the intelligibility of the "textually committed" aspect of the political question doctrine. Yet our approach is hardly novel.[19] Indeed, though the political question

(1979); *Consumers Union of United States v. Periodical Correspondents' Ass'n,* 515 F.2d 1341, 1347–48, 1351 (D.C.Cir.1975).

**15.** *Harrington v. Bush,* 553 F.2d 190, 214 (D.C. Cir.1977). *Harrington* and *Exxon, supra* note 14, do not explicitly refer to *Baker v. Carr's* political question analysis, but *Consumers Union* and *Metzenbaum, supra* note 14, do.

**16.** At most, the court in *Metzenbaum, supra* note 14, held nonjusticiable a challenge by legislators asserting only that the House's own operating rules had been violated. Not only were no constitutional claims at issue, but in addition the court noted that "judicial intervention may be appropriate where rights of persons other than members of Congress are jeopardized by failure to follow its own procedure." In the end, the *Metzenbaum* court dismissed that suit largely for the same "prudential considerations" that we ultimately rely on. *Compare* 675 F.2d at 1287–88, *with* note 24 and accompanying text *infra.*

**17.** *See* Henkin, *Is There A "Political Question" Doctrine?* 85 Yale L.J. 597, 605 n. 27 (1976): Judging from the cases, even the "textually demonstrable commitment" of an issue to the political branches apparently does not necessarily mean exclusive and final commitment to the political branches without judicial review, but only the kind of commitment found, say, in the grants to Congress in Arti-

cle I, § 8; the courts consider daily whether the political branches exercise power textually committed to them with due respect for constitutional limitations or prohibitions. (citations omitted).

**18.** *See also Yellin v. United States,* 374 U.S. 109, 143–44, 83 S.Ct. 1828, 1847–1848, 10 L.Ed.2d 778 (1963) (White, J., dissenting); *Christoffel v. United States,* 338 U.S. 84, 69 S.Ct. 1447, 93 L.Ed. 1826 (1949).

**19.** *See* Henkin, *supra* note 17, at 604: Although the Constitution provides that "Each House shall be the Judge of the ... Qualifications of its own Members," the Court held reviewable, and reversed, a judgment by the House that elected-Representative Adam Clayton Powell was not qualified. Although the same clause provides that each House "shall be the Judge of the Elections (and) Returns ... of its own Members," the Court in *Roudebush v. Hartke* [405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972)] reviewed and upheld a state procedure providing for a recount in an election for the United States Senate.

The Supreme Court has not recently held any issue to be textually committed by the Constitution to the other branches and therefore not justiciable—a "political question." And the Court's failure to require judicial abstention in those instances where scripture

doctrine itself is useful as a checklist of separation-of-powers concerns, *see Consumer Energy Council of America v. FERC,* 673 F.2d 425, 452–53 (D.C.Cir.1982), from the doctrine's very inception the Supreme Court noted the need to avoid reliance on it as a talismanic "label." *Baker v. Carr,* 369 U.S. at 210–11, 82 S.Ct. at 706–707. Rather the Court emphasized the continued importance of "case-by-case inquiry." *Id.* In the years since, the doctrine has, as former Chief Judge McGowan of this Court has written,[20] been the subject of "withering academic attack" which has "succeeded in analyzing the doctrine essentially out of existence." [21] While reports of the doctrine's death may be exaggerated, we agree that it is far more useful to examine "case-by-case" whether we would be unwise to intrude in "political" controversies.

For as Judge McGowan also commented in discussing lawsuits resembling the one we face here, "[a]lthough the existing methods that courts have used to forbear deciding these cases have proven unsatisfactory in varying degree, the judges who employed them were surely motivated by a proper respect for the political branches and a disinclination *to intervene unnecessarily* in their disputes." [22] Judge McGowan's solution, which as noted earlier was adopted in *Riegle v. Federal Open Market Committee,* 656 F.2d 873 (D.C.Cir.1981), was "that the best way to translate those concerns into principled decisionmaking is through the discretion of the federal court to grant or to withhold injunctive or declaratory relief." [23]

◼ *Riegle* was styled as a suit by a legislator against the executive branch, but like our case was essentially a suit by some

can most plausibly be read to require it leaves a strong sense that the present justices are not disposed to find many—or any—issues in fact so textually committed. (citations omitted). *But see Goldwater v. Carter,* 444 U.S. 996, 1002, 100 S.Ct. 533, 536, 62 L.Ed.2d 428 (1979) (Rehnquist, J., concurring).

**20.** McGowan, *supra* note 3, at 257, referring particularly to Henkin, *supra* note 17.

**21.** Professor Henkin summarizes:
The political question doctrine saw its heyday in the New Deal Court, and received its highest measure of devotion from Justice Frankfurter, perhaps its boldest articulation by Justice Black in *Colegrove [Coleman] v. Miller* [307 U.S. 433, 548–59 [448–59] 59 S.Ct. 972, 979–984, 83 L.Ed. 1385 (1939) ]. It was perhaps an expression of a wider, deeper mood by Justices appointed to restore judicial self-restraint and allow the elected governors to govern. . . .
Since Frankfurter and Black wrote, judicial review has had a new birth, its character and content reformed, and its place established as a hallmark of American political life, even a birthright of every inhabitant. I see no place in it for an exemption for uncertain "political questions." Would not the part of the courts in our system, the institution of judicial review, and their public and intellectual acceptance, fare better if we broke open that package, assigned its authentic components elsewhere, and threw the package away?
85 Yale L.J. at 625 (citations omitted). In stating the argument generally adopted by this opinion, Professor Henkin notes that

while there may be no basis for finding an issue nonjusticiable, there are traditional reasons why a court might refuse a remedy. The difference is not only or principally conceptual or academic. To deny a remedy on equitable grounds does not carve an exception to *Marbury v. Madison* for which there is no basis in constitutional text or in anything else relevant to constitutional interpretation. The traditional grounds for denying an equitable remedy are few and narrow and not frequently present.
*Id.,* at 621–22.

**22.** McGowan, *supra* note 3, at 262.

**23.** *Id.* In *Riegle,* the court stated:
The most satisfactory means of translating our separation-of-powers concerns into principled decisionmaking is through a doctrine of circumscribed equitable discretion. Where a congressional plaintiff could obtain substantial relief from his fellow legislators through the enactment, repeal, or amendment of a statute, this court should exercise its equitable discretion to dismiss the legislator's action . . . The standard would counsel the courts to refrain from hearing cases which represent the most obvious intrusion by the judiciary into the legislative arena: challenges concerning congressional action or inaction regarding legislation. Yet this standard would assure that nonfrivolous claims of unconstitutional action which could only be brought by members of Congress will be reviewed on the merits.
656 F.2d at 881.

members of Congress against others.[24] We invoke our remedial discretion in this setting because this case raises separation-of-powers concerns similar to *Riegle*'s, and the remedial discretion approach—which this circuit has used before—provides a more candid and coherent way of addressing those concerns.[25]

Our regard for candor and coherence may seem anomalous, because a doctrine of remedial discretion suggests the sort of rudderless adjudication that courts strive to avoid. But *Riegle* makes explicit what we also seek to emphasize: this is not an area fit for inflexible doctrines or bright-line tests. The Speech or Debate Clause possibly offers complete immunity within whatever boundaries courts may set around the "legitimate legislative sphere." Yet even those limits may be strained by egregious circumstances.[26] Otherwise, we must necessarily move carefully, faithful to our obligation to use our power where justice and the Constitution so require, but cautious when we do so.

Turning to this particular case, one can readily see the wisdom of not interfering with the House's method of allocating committee seats. In fact, this case is nearly identical to a suit the Ninth Circuit dismissed several years ago after Democratic representatives in Arizona challenged the Republican legislative leadership. *Davids v. Akers,* 549 F.2d 120 (9th Cir.1977).

Unlike us, the *Davids* court reached the merits: it held that neither voters nor their representatives were deprived of equal protection or First Amendment rights when minority party legislators were dispropor-

**24.** In *Riegle,* standing was granted because the court assumed, for purposes of the motion to dismiss, that the challenged statute "results in a deprivation of Senator Riegle's constitutional right to advise and consent regarding the appointment of the defendant officers of the executive branch." 656 F.2d at 877. The court ultimately dismissed the suit because the senator's fellow legislators were "capable of affording him substantial relief." 656 F.2d at 882. The court further noted, however, that a private plaintiff challenging the same statute might well be able to resist dismissal. "Because such a private plaintiff's suit would not raise separation-of-powers concerns, the court would be obliged to reach the merits of the claim." 656 F.2d at 881.

Today's case, however, does not fit neatly into *Riegle's* analysis. This is not simply a suit between opposing sides within one branch of government, nor is it simply a suit by interested private plaintiffs against the internal operations of a governmental branch. It is some of both. It still involves *Riegle's* concerns about intrusion into another branch's internal battles, while it also—as *Riegle* and *Metzenbaum, supra* note 16, foreshadowed—presents a compelling claim for judicial involvement because private plaintiffs' rights are at stake.

What cannot be seriously disputed is that we have broad discretion in deciding whether to issue equitable or declaratory relief. *See Weinberger v. Romero-Barcelo,* 456 U.S. 305 at 311–12, 102 S.Ct. 1798 at 1802–03, 72 L.Ed.2d 91 (1982); note 25 *infra.* It is perhaps fair for Judge Bork to want us to define the boundaries of our discretion, in the hope that it will not be abused in the future. For today, however, we have simply tried to defend the reasonableness

of why we have exercised our discretion the way we have.

**25.** Our shift from the phrase "equitable discretion" to "remedial discretion" indicates only that our appellants sought both injunctive and declaratory relief, unlike *Riegle's,* 656 F.2d at 877. "It is axiomatic that the request for declaratory relief is discretionary with the court, and that the request should be denied where 'it will not terminate the controversy or serve a useful purpose.'" *Winpisinger v. Watson,* 628 F.2d 133, 141 (D.C.Cir.1980).

There have been many cases where courts have refused to grant declaratory or injunctive relief for prudential reasons not even remotely related to neutral principles of law. One from this circuit that involved constitutional claims as significant and thorny as those in this case was *Lampkin v. Connor,* 360 F.2d 505 (D.C.Cir. 1966). There plaintiffs from various states who opposed discriminatory voting practices like literacy tests and poll taxes sought to have census officials implement the provisions of Section 2 of the Fourteenth Amendment. That provision seemingly requires a reduction in the basis of a state's representation in Congress when that state denies or abridges the right to vote. The unanimous court in *Lampkin* declined to adopt the lower court's denial of standing, or the alternative suggestion that the case was nonjusticiable under the political question doctrine. Instead, the court exercised its discretion to withhold declaratory relief, and explained that especially because the recently-passed Voting Rights Act offered significant hope for remedying the plaintiffs' complaints, judicial action at that time would be unwise.

**26.** *See* note 10 *supra.*

tionately underrepresented on legislative committees. Judge Duniway quoted from an English history text and noted that "[t]he principle that such procedures are for the House itself to decide is as old as the British Parliament." 549 F.2d at 123. And in an extensive discussion (that gives new meaning to the phrase "parade of horribles"), *Davids* spelled out how disastrously intrusive it would be if we were to accept appellants' invitation to restructure congressional committees. To quote only a few of the Ninth Circuit's objections:

> Unless Arizona voters differ markedly from those of other states, it is almost certain that every member of Arizona's House was put there by a mixture of voters—Republican, Democratic, and Independent, with perhaps a few members of splinter parties thrown in. It is nonsense to say that every member who ran on the Democratic ticket represents only Democrats... [D]id those who voted for the winners by some similar sort of osmosis, acquire the right to assert and transmit to the winning candidates not only their own Fourteenth Amendment rights but also those of all of the voters of their district who voted for the loser?... [Or m]ust we next, in the name of equal protection, weight the vote of each member in the House in proportion to the vote

that he received out of the total vote in his district? ...

> What if one member of the House runs as a socialist or a conservative and wins? He will be 1.66% of the membership. Is he entitled to a seat on a committee? Which one? Whom is he to displace—a Democrat or a Republican? In either case, why? ...

> Particular items of legislation frequently produce large scale crossing of party lines. Are committee appointments to be juggled and rejuggled depending upon which measure is coming before a committee? ... If so, are the adjustments to be based upon the supposed views of each member, or those of his constituents, or what?

549 F.2d at 124–25.

These objections provide more than enough reason to conclude that we should not adjudicate this controversy. It is not that we think a remedy could not be fashioned.[27] Rather, we simply believe it would be, to quote the *Davids* court again, a "startlingly unattractive" idea, given our respect for a coequal branch of government, for us "to tell the Speaker of the ... House of Representatives how many Democrats, and perhaps even which Democrats, he is to appoint to the standing committees, and perhaps to each such committee." 549 F.2d

---

**27.** The Ninth Circuit declared, apparently in dictum, that a "judicially discoverable and manageable standard cannot be found" for resolving the dilemmas it had identified in the *Davids* suit. While that phrase originated in *Baker v. Carr's* discussion of nonjusticiable political questions, the Ninth Circuit expressly did not find the *Davids* suit to be nonjusticiable because of the political question doctrine.

Elsewhere, this circuit has said that such "prudential considerations ... are inextricably linked to the question of standing." *Winpisinger v. Watson,* 628 F.2d 133, 139–40 & n. 31 (D.C.Cir.1980). *See also Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976) (where the Supreme Court incorporated in its standing analysis an inquiry into whether an alleged injury "is likely to be redressed by a favorable decision"); *Greater Tampa Chamber of Commerce v. Goldschmidt,* 627 F.2d 258 (D.C.Cir.1980) (standing denied because plaintiffs, who were challenging an air-travel agreement alleged to have been improperly imple-

mented by the Secretary of State without Senate ratification, could not show that court invalidation would enable them to obtain more amenable terms than those of the current agreement).

We do not deny standing to appellants on the grounds that we could not administer relief. Use of the standing doctrine would be appropriate if ordering a change in the committee structure would fail to remedy appellants' complaints. *See id.* But while the Ninth Circuit may be right that it would be difficult to develop a thorough remedy, we probably could fashion a mathematically administrable remedy— even if it proved as awkward as the Supreme Court's remedies in the voting rights cases. *See* Dixon, *Reapportionment in the Supreme Court and Congress: Constitutional Struggle for Fair Representation,* 63 MICH.L.REV. 209 (1964). Once again, we treat our prudential reservations as part of our consideration of whether to provide relief, not as part of our inquiry into our Article III powers.

at 123. Our discretion to withhold equitable and declaratory relief supplies us with ample foundation upon which to base our decision. Thus we affirm the district court's dismissal, though not because of barriers presented by the Speech or Debate Clause, or the political question doctrine.

BORK, Circuit Judge, concurring:

Appellants complain that the Democratic majority in the House of Representatives has assigned Republicans a proportion of committee and subcommittee seats substantially lower than the proportion of Republicans in the House as a whole. Appellants sue in their capacities as Republican members of the House and as voters and also purport to represent classes of Republican Representatives and voters represented by Republicans. The gravamen of their complaint is that the Democrats' action has unconstitutionally diminished the influence of appellants and those they would represent in this case in the legislative processes of the House. We affirm the district court's dismissal of the complaint. The majority reaches this result under a doctrine of remedial discretion which is a variant of the doctrine announced in *Riegle v. Federal Open Market Committee,* 656 F.2d 873 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981). My colleagues find that plaintiffs have standing to maintain this action.

In my view, jurisdiction is absent because the plaintiffs lack standing. I concur in the judgment for that reason. A brief review of the concept of standing, particularly the standing of legislator plaintiffs as it has developed in this circuit, will demonstrate why I think that my colleagues' position is unsupportable.

## I.

The concept of standing relates to the fitness of a particular party to litigate a particular issue. To be a fit litigant the party must have "a personal stake in the outcome of the controversy" so "as to assure that concrete adverseness which sharpens the presentation of issues." *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). There is, however, more to the concept of standing than that. The standing requirement contains so many variables that the Supreme Court once felt impelled to say that "[g]eneralizations about standing to sue are largely worthless as such," though one valid generalization is that the question is to be "considered in the framework of Article III which restricts judicial power to 'cases' and 'controversies.'" *Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 151, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). This court recently summarized the elements of standing in *Riegle,* 656 F.2d at 878: "the maximum burden which a plaintiff must bear to attain standing [consists of the] establishment of (i) injury-in-fact (ii) to an interest protected by the relevant law (iii) where the injury is caused by defendants' actions or capable of judicial redress." The element of "injury-in-fact," upon which the present case turns, is sometimes stated as "judicially cognizable injury." *Metcalf v. National Petroleum Council,* 553 F.2d 176, 187 (D.C.Cir.1977).

The term "judicially cognizable injury" brings to the surface what should be obvious in any event: injury in fact, far from being a simple, descriptive term, is a concept freighted with policies that limit the kinds of injury courts may consider. One might suppose that any person who feels strongly that he has been hurt by another's act possesses "that concrete adverseness which sharpens the presentation of issues." But the law does not view the matter that simply. Courts may take cognizance only of injuries of certain types, and the limitations are often defined less by the reality of the litigant's "adverseness" than by the courts' view of the legitimate boundaries of their own power. "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise. In both dimensions it is founded in concern about

the proper—and properly limited—role of the court in a democratic society." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975) (citation omitted).

This theme is apparent in many Supreme Court decisions. In *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), for example, plaintiffs sued in their capacities as both taxpayers and citizens to require the Secretary of Defense to remove members of Congress from membership in the military reserve. The suit alleged that such membership violated the "Incompatibility Clause" of Art. I, § 6, cl. 2: "no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office." The Supreme Court held that plaintiffs lacked standing to sue because, in essence, plaintiffs alleged an injury that was common to all citizens and taxpayers and so asserted only "generalized grievances." *See Reservists,* 418 U.S. at 217, 94 S.Ct. at 2930 (citing *Flast v. Cohen,* 392 U.S. 83, 106, 88 S.Ct. 1942, 1955–1956, 20 L.Ed.2d 947 (1968)). Such grievances are not that direct, palpable harm that injury in fact requires. *See United States v. Richardson,* 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *Ex parte Levitt,* 302 U.S. 633, 58 S.Ct. 1, 82 L.Ed. 493 (1937). It did not matter that plaintiffs in *Reservists, Richardson, Tatum,* and *Levitt* were motivated to litigate quite as much as any other plaintiffs, for, as the Chief Justice stated in *Reservists:*

> We have no doubt about the sincerity of respondents' stated objectives and the depth of their commitment to them. But the essence of standing
>
> > "is not a question of motivation but of possession of the requisite ... interest that is, or is threatened to be, injured by the unconstitutional conduct." *Doremus v. Board of Education,* 342 U.S. 429, 435, [72 S.Ct. 394, 397, 96 L.Ed. 475] (1952).

418 U.S. at 225–26, 94 S.Ct. at 2934. Similarly, in refusing to accept as judicially cognizable a taxpayer organization's complaint that the conveyance of government-owned property to an educational institution supervised by a religious order violated the Establishment Clause of the First Amendment, the Court stated:

> Although [plaintiffs] claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by the plaintiffs *as a consequence* of the alleged constitutional error, other than the psychological consequences presumably produced by observation of conduct with which one disagrees. This is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms.

*Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 485–86, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982) (emphasis in original).

The law, of course, often takes account of psychological consequences. The Supreme Court's refusal to do so when a plaintiff makes the serious assertion that the harm is created by the unconstitutional conduct of the government can only mean that the Court perceives that to confer standing in such cases would impermissibly alter its function. To make judicially cognizable all injuries that persons actually feel and can articulate would widen immeasurably, perhaps illimitably, the authority of the federal courts to govern the life of the society. "Relaxation of standing requirements is directly related to the expansion of judicial power." *Richardson,* 418 U.S. at 188, 94 S.Ct. at 2952 (Powell, J., concurring). Conversely, by refusing to expand standing, by attempting to confine jurisdiction so far as possible to cases of a "form historically viewed as capable of judicial resolution," *Flast v. Cohen,* 392 U.S. 83, 101, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968), courts can at least attempt to keep their scope of authority constant over time and so leave the resolution of a wide variety of problems to other institutions, both public and private. All of the doctrines that cluster about Article III—not only standing but

mootness, ripeness, political question, and the like—relate in part, and in different though overlapping ways, to an idea, which is more than an intuition but less than a rigorous and explicit theory, about the constitutional and prudential limits to the powers of an unelected, unrepresentative judiciary in our kind of government.

It is clear, then, that standing doctrine incorporates concerns about the role proper to the federal judiciary. This case presents the further questions whether among those concerns is the issue of separation of powers and whether separation-of-powers considerations are relevant to a request that a court order the reallocation of committee assignments in Congress. It is on these questions that I differ from my colleagues. It is true that the Supreme Court once indicated that separation of powers is no part of the Article III component of standing:

> The question whether a particular person is a proper party to maintain the action does not, by its own force, raise separation of powers problems related to improper judicial interference in areas committed to other branches of the Federal Government. Such problems arise, if at all, only from the substantive issues the individual seeks to have adjudicated. Thus, in terms of Article III limitations on federal court jurisdiction, the question of standing is related only to whether the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution.

*Flast v. Cohen,* 392 U.S. at 100–101, 88 S.Ct. at 1953. Subsequently, however, the Court suggested that separation-of-powers considerations properly find a place in the judge-made prudential aspects of standing:

> [T]he Court has held that when the asserted harm is a "generalized grievance" shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction. *E.g., Schlesinger v. Reservists to Stop the War, supra; United States v. Richardson, supra; Ex parte Lèvitt,* 302 U.S. 633, 634 [58 S.Ct. 1, 1, 82

L.Ed. 493] (1937) .... Without such limitations—closely related to Art. III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions....

*Warth v. Seldin,* 422 U.S. at 499–500, 95 S.Ct. at 2205–2206. That alone would be enough to demonstrate that the standing concept incorporates concerns about the powers appropriate to each branch of the federal government and that we must take those concerns into account here. The Court's 1982 decision in *Valley Forge,* however, goes farther and reads separation-of-powers concepts back into that part of the standing requirement which rests upon a constitutional, rather than a prudential, foundation. Discussing the requirement of injury, Justice Rehnquist's opinion for the majority states:

> In this manner does Art. III limit the federal judicial power "to those disputes which confine federal courts to a role consistent with a system of separated powers and which are traditionally thought to be capable of resolution through the judicial process." *Flast v. Cohen, supra,* [392 U.S.] at 97 [88 S.Ct. at 1951].

*Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758. After noting that "[t]he exercise of the judicial power also affects relationships between the co-equal arms of the national government," *id.,* the opinion goes on to quote with approval from Justice Powell's concurring opinion in *Richardson:*

> "[R]epeated and essentially head-on confrontations between the life-tenured branch and the representative branches of government will not, in the long run, be beneficial to either. The public confidence essential to the former and the vitality critical to the latter may well erode if we do not exercise self-restraint in the utilization of our power to negative the actions of other branches."

454 U.S. at 474, 102 S.Ct. at 759 (citation omitted).

Immediately after this passage quoted in *Valley Forge*, Justice Powell's concurrence in *Richardson* continues:

> We should be ever mindful of the contradictions that would arise if a democracy were to permit general oversight of the elected branches of government by a non-representative, and in large measure insulated, judicial branch.

418 U.S. at 188, 94 S.Ct. at 2952 (footnote omitted). The majority does not believe *Valley Forge* will bear the reading I give it. In view of that opinion's own language and the language it quotes, however, I do not see how *Valley Forge* can bear any other construction. Whether the requirement is rooted in Article III or in judicial prudence, I conclude, therefore, that the Supreme Court continues to regard the standing concept as informed by considerations of separation of powers. We should so apply the requirement here.

Since we must accept the complaints' allegations as true, we can permit ourselves no doubt that a failure to achieve a share of committee and subcommittee assignments in proportion to their numbers in the legislative body results in a diminution of a political party's influence and effectiveness in forwarding or opposing legislation. In consequence, appellants' influence and effectiveness are diminished. If the constitutional standards that appellants urge upon us mandate proportional representation, an issue that neither the majority nor I reach, then it is clear that appellants have, in fact, suffered an injury. The question to be answered, however, is whether that fact of injury is what the law means by injury in fact. I think not.

Prior to the *Riegle* decision in 1981, this circuit had worked out a fairly definite formula to relate separation-of-powers concerns to the problem of legislator standing. In light of *Valley Forge*, I regard this formula as the law of this circuit, and would apply it without now inquiring as to whether a less permissive rule might be preferable. In *Kennedy v. Sampson*, 511 F.2d 430 (D.C.Cir.1974), a decision I think this court should reexamine under more appropriate circumstances, we found that a senator had standing to challenge the legality of the President's pocket veto of an enacted bill because the effect was to make a complete nullity of the senator's vote. In *Harrington v. Bush*, 553 F.2d 190 (D.C.Cir.1977), on the other hand, a member of the House of Representatives complained that the secrecy of some Central Intelligence Agency activities under statutory concealment provisions impaired his effectiveness as a legislator. We found that an inadequate basis for injury in fact. This distinction between diminution of a legislator's influence and nullification of his vote was adopted by the en banc court in *Goldwater v. Carter*, 617 F.2d 697 (D.C.Cir.), *judgment vacated on other grounds*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979). The per curiam opinion, joined by Judges McGowan, Robinson, Wilkey, and Wald, found the plaintiff legislators had standing, but only because they met a very demanding test:

> To be cognizable for standing purposes, the alleged diminution in congressional influence must amount to a disenfranchisement, a complete nullification or withdrawal of a voting opportunity; and the plaintiff must point to an objective standard in the Constitution, statutes or congressional house rules, by which disenfranchisement can be shown.

*Goldwater v. Carter*, 617 F.2d at 702.[1]

The Supreme Court vacated the judgment of this court in *Goldwater* because

---

1. Significantly, two other members of this court, applying a standard still more strict, would have denied the legislators standing. Chief Judge Wright, writing for himself and Judge Tamm, stated:

 > [W]here a legislator alleges Executive impairment of the effectiveness of his vote, his injury can only be derivative. He cannot suffer injury in fact unless Congress has suf-

fered injury in fact. Congress suffers no injury unless the Executive has thwarted its will; and there is no such will to thwart unless a majority of Congress has spoken unequivocally. Unless Congress has taken all final action in its power to exercise its constitutional prerogative, any injury an individual legislator suffers may find its source not in the President, but in his colleagues in

various Justices thought that either the doctrine of ripeness or that of political question should have prevented us from reaching the merits. None of the Justices who so concluded mentioned the question of standing. This led the *Riegle* court to conclude that the standing concept was no longer viewed by the Supreme Court as a proper vehicle for separation-of-powers concerns; accordingly, the *Riegle* opinion shifted those considerations into a "doctrine of circumscribed equitable discretion." 656 F.2d at 881. The evidence for the conclusion that the Supreme Court had silently rejected *Warth v. Seldin* in *Goldwater* was very thin. Justices who found the case nonjusticiable on grounds of ripeness or political question had no occasion to discuss standing. The *Valley Forge* decision, which came after *Riegle,* demonstrates—conclusively, I believe—that the concept of standing continues to incorporate separation-of-powers considerations. The premise on which *Riegle* rested, therefore, is no longer valid.

There are compelling reasons rooted in the concept of separation of powers, and in particular in the proper role of courts in relation to the political branches, for us to adopt again the position we took in *Goldwater,* and to hold that appellants lack standing here. Appellants' complaint invites federal courts to participate extensively in the internal processes of Congress. We should decline the invitation because of the consequences of accepting it. If an allegation of a diminution of influence on the legislative process were sufficient to confer standing, federal courts doubtless would be invited to rule upon the ways in which committee and subcommittee members are chosen, since, party lines aside, it is clear that those chosen for committees on the budget or foreign affairs or rules generally have more influence than those not so chosen. Perhaps we could be called upon to rule on filibusters,

since those who filibuster may have disproportionate influence over legislative outcomes. Courts might be asked to control the order in which legislation is brought to the floor, debated, and voted on. Surely we would be requested to remedy disproportionate assignments of staff as between committee majorities and minorities, for those assignments affect influence on the legislative process. Examples of this sort could be multiplied, but perhaps enough has been said to indicate why federal courts should firmly refuse to enter upon the wholly inappropriate task of ensuring absolute equity in Congress's legislative procedures. It is absurd to think that courts should purge the political branches of politics.[2]

The function appellants would have us perform would be extraordinarily intrusive, involving frequent, "repeated and essentially head-on confrontations" between Congress and the federal courts. Appellants would, for example, have the district court order appellees O'Neill, Wright, Long, the Democratic Steering Committee, and the Democratic Caucus to allocate additional committee and subcommittee seats to Republicans so that Republican assignments will be in proportion to their strength in the House. This injunction or mandamus would be enforced by the court's power to hold appellees in contempt should they fail to reconstitute the House's committees and subcommittees as desired. Merely to state what is sought is to make plain that appellants propose nothing less than a revolution in the judiciary's relationship to the political branches. How extraordinarily intrusive such a judicial function would be may be seen by imagining reciprocal cases. For courts to reassign congressional committee seats would be no less intrusive than for Congress to enact a law forbidding the members of this court from conferring on

Congress. Where Congress itself, and not the Executive, renders an individual legislator's vote ineffective, the courts have no role. 617 F.2d at 712 (footnotes omitted).

**2.** As the concurring judges said of the plaintiff senators in *Goldwater:* "Any harm they have

suffered can be 'fairly traced' to their minority position in the legislature, and to the vagaries of politics. Surely courts cannot be expected to manage the calendar of the United States Senate." 617 F.2d at 714.

the decision of cases or forbidding specified judges from sitting on cases of a particular type. If the courts would not accept such invasions of their sphere, they ought not attempt the invasion of Congress's sphere sought by appellants.

But there are more than considerations of comity and respect here, more than historical tradition and the constitutional need to retain limits on judicial power. There is the very real problem of a lack of judicial competence to arrange complex, organic, political processes within a legislature so that they work better. The caution the late Alexander M. Bickel addressed to political reformers may profitably be heeded by judges as well:

> James I spoke of the mystery of the King's power. The institutions of a secular, democratic government do not generally advertise themselves as mysteries. But they are. What they do, how they do it, or why it is necessary to do what they do is not always outwardly apparent. Their actual operation must be assessed, often in sheer wonder, before they are tinkered with, lest great expectations be not only defeated, but mocked by the achievement of their very antithesis.

A. Bickel, *Reform and Continuity* 2 (1971) (revised and expanded version of A. Bickel, *The New Age of Political Reform* (1968)). Courts do not understand—indeed, probably not all legislators understand—how the various rules, customs, and practices of the legislature interact and how changing one aspect could produce the most unexpected distortions of the legislative process elsewhere. Nor can I imagine that extensive trials would educate courts to become experts on legislative processes so that they could improve those processes. The task, if there is a task that needs doing, is one for political reform by those intimately familiar with the complex arrangements and interactions involved.

By contrast, the rule of *Kennedy v. Sampson* and *Goldwater,* requiring a nullification of a legislator's vote for legislator standing entails few of the problems that would flow from standing in a case like this one. The occasions of judicial intervention will be few and limited. According standing in such a case does not adopt a principle that requires courts to judge the propriety of all the manifold ways in which a legislator's influence may be diminished. If providing a judicial remedy in such a case might have a degree of intrusiveness about it, our concern should be lessened by the fact that the vote denied is a structural feature of our government, clearly assumed in Article I of the Constitution, as equal legislative influence or committee membership is not. Moreover, no question of judicial competence to rearrange complex political processes arises.

It follows from this discussion that there can be no injury in fact unless there has occurred a nullification of a legislator's vote. This conclusion would bar standing for both legislators and voters where only diminution of influence is alleged because the harm claimed and the separation-of-powers principles, which prevent the court from interfering in this fashion with the political branches, are the same in both cases. I would hold, therefore, that appellants have not alleged a judicially cognizable injury and so have no standing to maintain this action.

## II.

The majority argues that plaintiffs have standing to maintain this action but that their suit should be dismissed through an exercise of the court's "remedial discretion." It seems necessary to say a word about my colleagues' rationale, because the difference between their position and my own rests on more than a reading of precedent. It reflects a disagreement about the role of the federal courts in our government.

At the level of case law interpretation, I have sufficiently expressed my belief that, even at the time it was decided, *Riegle's* reasoning proceeded from a false premise about the Supreme Court's view of standing and that the invalidity of that premise was once more demonstrated by the Supreme Court's *Valley Forge* decision. My colleagues nevertheless maintain that *Riegle* is still correct. They find that standing exists when a legislator plaintiff alleges a diminu-

tion of his influence in Congress. The majority's approach, however, transforms the law enunciated in *Riegle.*

*Riegle* at least laid down firm guidelines for the application of its doctrine of "circumscribed equitable discretion":

> In short, our standard would counsel dismissal of congressional plaintiff actions only in cases in which (i) the plaintiff lacks standing under the traditional tests, or (ii) the plaintiff has standing but could get legislative redress and a similar action could be brought by a private plaintiff.

656 F.2d at 882. These guidelines themselves were a remarkable assertion of judicial power, for, as the court had previously noted:

> Thus, such actions as impeachment, expulsion proceedings, impoundment, and certain acts of the executive not subject to direct legislative redress or private party challenge (*e.g.,* the pocket veto in *Kennedy v. Sampson, supra*) would be subject to judicial review in a congressional plaintiff case. These circumstances (which are not intended to exhaust the possibilities) represent situations where absent congressional plaintiff actions, it is possible that non-frivolous claims of unconstitutional action would go unreviewed by a court.

*Id.* Yet it is of course precisely the function of the Article III limitations on jurisdiction, through such doctrines as standing and political question, to ensure that non-frivolous claims of unconstitutional action will go unreviewed by a court. That is what the Supreme Court held was required in cases such as *Richardson, Reservists,* and *Valley Forge.*

Now, however, the majority suggests that we relax still further the requirements of *Riegle:*

> We invoke our remedial discretion in this setting because this case raises separation-of-powers concerns similar to *Riegle's,* and the remedial discretion approach—which this circuit has used before—provides a more candid and coherent way of addressing those concerns.
>
> Our regard for candor and coherence may seem anomalous, because a doctrine of remedial discretion suggests the sort of rudderless adjudication that courts strive to avoid. But *Riegle* makes explicit what we also seek to emphasize: this is not an area fit for inflexible doctrines or bright-line tests.

*Supra* at 1174–1175 (footnote omitted).

If they were applying *Riegle,* my colleagues would dismiss the action by plaintiffs in their capacities as legislators because legislative redress is available and a similar action could be brought by a private plaintiff. But they could not dismiss the entire action since there are private plaintiffs before us: the congressmen also sued in their capacities as voters and as representatives of the classes of all voters represented in the House by Republicans.[3] If the legislators here have standing, it is difficult to see why voters whose influence in Congress has been allegedly unconstitutionally diminished would not also have standing. *Riegle* states that such plaintiffs could

---

**3.** The district court found that it lacked jurisdiction over appellants' claims "as voters and as Members of Congress." *Vander Jagt v. O'Neill,* 524 F.Supp. 519, 520 (D.D.C.1981). Nowhere does the majority suggest that appellants' nonlegislator claims are not properly before us. As far as I am able to determine, there are private individuals in this lawsuit. My colleagues acknowledge this, *supra* at 1169, note 4, and are willing to extend *Riegle* beyond its terms to private suits. Indeed, my colleagues contend that the presence of private parties creates difficulties for my application of the separation-of-powers component of standing. *Id.*

This contention misapprehends my position in two ways. First, separation-of-powers con-

siderations do not, strictly speaking, operate here on the basis of the plaintiffs' status as legislators. Rather, in keeping with the standing doctrine, my concern is with the separation-of-powers implications of the *harm* alleged: "diminution of influence" in the legislative process. Appellants complain of this single harm in both of their capacities. Yet counting this as a harm sufficient to create standing would bring the courts into the internal affairs of Congress whether the plaintiff was a legislator or a voter. The separation-of-powers concerns are the same in either case.

Second, the nullification-of-vote standard is wholly consistent with the malapportionment cases. A Democratic Senator would have standing under that standard to challenge a

not be dismissed under a doctrine of circumscribed equitable discretion:

> While we discourage congressional plaintiffs in such circumstances [availability of legislative redress and private plaintiffs], it is probable that a private plaintiff could acquire standing to raise the issue of unconstitutionality before a court. Because such a private plaintiff's suit would not raise separation-of-powers concerns, the court would be obliged to reach the merits of the claim.

656 F.2d at 881.

While, as discussed above, I think a private plaintiff's suit raises identical separation-of-powers concerns because those concerns are about the relationship of the courts to Congress, it is clear that, whatever the majority proposes, it is not that we hold to *Riegle*.

This becomes even clearer when my colleagues offer their rationale for dismissing this suit: giving orders to the Speaker of the House of Representatives is a "startlingly unattractive" idea. *Supra* at 1176. It is, but the law deserves and is susceptible of greater definition than that. Even *Riegle* provides more, and the standing rule enunciated by this court in *Goldwater* provides much more. "[R]udderless adjudication" is not a necessity.

My colleagues' reliance upon the rationale of *Davids v. Akers*, 549 F.2d 120 (9th Cir. 1977), does not help matters. That case is nearly identical to this, and the *Davids* court, in a passage the majority quotes, indicates the difficulty courts would have in framing rules to deal with the subject. 549 F.2d at 125. Indeed, the *Davids* opinion,

though it had held that the political question doctrine posed no bar, concluded its recitation of problems by saying that "a judicially discoverable and manageable standard cannot be found," *id.*, though that is one of the categories of nonjusticiable political questions set out in *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). It is clear that many of the difficulties recited relate to defining the rights of legislators, not to the fashioning of relief. This suggests to me that *Davids* and the majority are actually applying the political question doctrine, here under the name of remedial discretion. The shift in terminology is not insignificant. Political question, like standing, is a doctrine that raises a jurisdictional bar to judicial power, while remedial discretion, as described in Judge Gordon's opinion for the majority, raises no bar and grants the judiciary unfettered discretion to hear a case or not, depending on the attractiveness of the idea.

My colleagues' disinclination to rest this case upon a jurisdictional ground—whether that of standing or political question—rests squarely upon the erroneous notion, expressed in *Riegle* and reiterated today, that there must be judicial power in all cases and that doctrines must not be adopted which might frustrate that power.[4] Thus, the majority argues:

> Thus while there are compelling prudential reasons why we should not interfere in the House's distribution of committee seats, it is nevertheless critical that we do not deny our jurisdiction over the claims in this case. As long as it is conceivable that the committee system

---

rule that counted his vote as one-third of a Republican's just as much as he would have standing to challenge a rule that counted it not at all. Just such a mathematically calculable reduction of the vote (as opposed to a reduction of generalized influence) is the harm in malapportionment cases; this is a necessary result of the application of the Equal Protection Clause and the one-man one-vote rule.

4. My colleagues note that courts sometimes review arguably internal acts of legislatures. *Supra* at 1170–1171. These cases stand for the proposition that some such actions create standing; in no way do they suggest that legislative actions producing "diminution of influ-

ence," as opposed to the nullification of a vote, create an injury in fact. *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the most important of these cases, involved Powell's exclusion from the House. The Supreme Court did not address standing. In assuming that standing existed, *Powell* is consistent with the rule of *Goldwater:* denied his seat, Powell was denied his vote, and had standing to sue. Similarly, *Bond v. Floyd*, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966), which did not discuss standing, involved an exclusion from the Georgia legislature. *United States v. Ballin*, 144 U.S. 1, 5, 6, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892), which upheld a congressional rule, also without a discussion of

could be manipulated beyond reason, we should not abandon our constitutional obligation—our duty and not simply our province—"to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 [2 L.Ed. 60] (1803); *United States v. Nixon*, 418 U.S. 683 [94 S.Ct. 3090, 41 L.Ed.2d 1039] (1974). *Supra* at 1170. Of course, when a court finds a jurisdictional bar to its exercise of power, it does state what the law is. When, on the other hand, a court claims a discretion, whose contours are not suggested, to decide or not to decide, the court refuses to say what the law is.[5] Moreover, the assertion that to find a lack of jurisdiction is an abandonment of a constitutional duty to pronounce upon the merits of any issue offered the court can only mean that all limitations on the jurisdiction of Article III courts, including those derived from Article III itself, are unconstitutional. That proposition may fairly be described as novel. The Supreme Court does not subscribe to it. Very recently, in *Valley Forge*, a decision that appears to be particularly inconvenient for the standing determination by the majority, the Court repeated its rejection of a similar contention: "But '[t]he assumption that if respondents have no standing to sue, no one would have standing, is not a reason to find standing.' *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S., at 227 [94 S.Ct. at 2935]." 454 U.S. at 489, 102 S.Ct. at 489.

In short, I find nothing in *Riegle* or in the majority's opinion that adequately explains the conclusion that plaintiffs have standing. Nor do I find anything that justifies the assumption of an unconfined judicial power to decide or not to decide; just such a power, of course, inheres in the version of remedial discretion offered today. Since my view of standing requires affirmance of the district court, I do not reach the issues presented by the Speech or Debate Clause and the political question doctrine.

---

standing, merely suggested in dicta that such rules are sometimes reviewable. None of these cases suggests that diminution of influence is a judicially cognizable injury; none of them even addresses the question.

5. The same reluctance to relinquish the possibility of power in future cases seems to underlie my colleagues' refusal to decide the issue raised under the Speech or Debate Clause: "Because our remedial discretion provides sufficient foundation for our dismissal of this suit, we decline to affirm the district court's invocation of the Speech or Debate Clause, which again might hamstring us in the future." *Supra* at 1171–1172 (footnote omitted).

It is, moreover, a dubious practice to decide the question of remedy without deciding the Speech or Debate Clause issue. The district court regarded the Speech or Debate Clause as jurisdictional. 524 F.Supp. at 521. The majority does not explicitly state whether it regards

the Clause as jurisdictional. Its theory, however, rests implicitly on the proposition that the Clause is non-jurisdictional. It is true, as the opinion says, that it does not decide the merits of the case; rather, it skips over them (as opposed to stopping short) to decide the case on the grounds of the remedy—a question that properly comes *after* the merits. At the least, this departs from the Supreme Court's recently announced principle that Speech or Debate Clause issues are generally to be dealt with before the merits are reached. *Davis v. Passman*, 442 U.S. 228, 236, 99 S.Ct. 2264, 2272, 60 L.Ed.2d 846 n. 11 (1979) (explaining departure from usual priority rule). One of the dissents in *Davis* argues that prior determination of Speech or Debate Clause issues is a near-absolute, not merely a general, requirement. 442 U.S. at 251, 99 S.Ct. at 2280 (Stewart, J., dissenting).