Craig E. DAVIDS et al.,
Plaintiffs-Appellants,

v.

Stan AKERS, Defendant-Appellee.

No. 75–3515.

United States Court of Appeals,
Ninth Circuit.

Jan. 13, 1977.

Michael J. Valder (argued), of Treon, Warnicke & Dann, Phoenix, Ariz., for plaintiffs-appellants.

Robert O. Lesher (argued), of Lesher, Kimble, Rucker & Lindamood, Tucson, Ariz., for defendant-appellee.

OPINION

Before BROWNING, BARNES and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

Plaintiffs appeal from a judgment dismissing their action. We affirm.

## I. *The Facts.*

Sixteen of the plaintiffs are members of the House of Representatives of the Thirty-second Legislature of the state of Arizona. They were elected in November, 1974, and ran as nominees of the Democratic party. They are joined by eight Democratic voters who voted in the November, 1974 election for successful Democratic candidates for the Arizona House of Representatives. These plaintiffs purport to sue on behalf of all other persons similarly situated; the 16 members of the House do not claim to be representatives of a class.[1]

The trial court, on plaintiffs' motion for summary judgment and defendants' answer and motion to dismiss, which raised defenses of lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted, gave judgment for defendants.

The facts stated in the complaint and admitted in the answer, supplemented by affidavits in support of the motion for summary judgment, are these: Sixty persons were elected to the House in November, 1974. Of these, 33 are Republicans and 27 are Democrats. Thus 55 percent of the members are Republicans and 45 percent are Democrats. Defendant Akers, a Republican is Speaker of the House. Under the rules of the House, he appoints the standing committees, of which there are 14. His appointments to certain committees gave less than 45 percent of the places to Democrats. In making his appointments, he did not follow the recommendations of the caucus of Democratic members, which asked for proportionate appointments of Democrats (i. e., approximately 45 percent) to standing committees, and that certain named Democrats be appointed to particular committees. He filled approximately 34 percent of the committee memberships with Democrats and 66 percent of them with Republicans.

As to certain committees, the disparity is greater, and plaintiffs stress these disparities because of the relative importance of the committees. The most powerful committee, plaintiffs say, is the Standing Committee on Rules. Proposed bills must clear both the standing committee having subject matter jurisdiction and Committee on Rules. The latter Committee makes the final decision as to whether any House bill, or any bill passed by the Senate, can be brought to the floor of the House for a vote. Only a two-thirds vote of the House can overrule the Committee. The Committee on Rules has 11 members; none is a Democrat; all are Republicans.

Another important committee is the Standing Committee on Appropriations. It has 13 members; two are Democrats; 11 are Republicans. It has three subcommittees; two have one Democratic member each; one has no Democratic member. The Joint Legislative Budget Committee has seven House members; only one is a Democrat. The Legislative Council has six House members; only one is a Democrat.

According to the plaintiffs, all of this deprives the Democratic House members, and the voters who elected them, of rights guaranteed to them by the First and Fourteenth Amendments to the United States Constitution and by 42 U.S.C. § 1983. The district court's jurisdiction is predicated on 28 U.S.C. § 1343.

## II. *Mootness.*

Members of Arizona's House of Representatives are elected to two-year terms. We understand that the Thirty-second Legislature has adjourned *sine die,* and that a new House was elected on November 2, 1976. Thus there is a question—not discussed by the parties—whether the case is moot.

We conclude that it is not. There is a class of cases in which the Supreme Court

---

1. The trial judge made no ruling on the class action phase of the case. We express no opinion about it.

has declined to apply the usual rules of mootness, cases presenting important questions such that "their consideration ought not to be, as they might be, defeated, by short term orders, capable of repetition, yet evading review . . . ." *Southern Pacific Terminal Co. v. I.C.C.,* 1911, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310. *See also Moore v. Ogilvie,* 1969, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1; *Roe v. Wade,* 1973, 410 U.S. 113, 125, 93 S.Ct. 705, 35, L.Ed.2d 147; *Baldwin v. Redwood City,* 9 Cir., 1976, 540 F.2d 1360, 1365; *Webster v. Mesa,* 9 Cir., 1975, 521 F.2d 442, 443; *Rosenfield v. Southern Pacific Co.,* 9 Cir., 1971, 444 F.2d 1219, 1222.

Here, although the Thirty-second Legislature has adjourned, the Thirty-third will soon convene, adopt rules, and choose a speaker. If he be a Republican, and he be the defendant Akers, no problem will arise. If a different speaker, whatever his party, be chosen, he can be substituted as a defendant by appropriate proceedings. And if he does not desire to defend, we have no doubt that other members of the House who do desire to defend can be found. The case is not moot.

### III. *Jurisdiction.*

### A. *Political Question—Separation of Powers.*

Insofar as these labels may be thought to raise a question as to the jurisdiction of the district court in this case, *Baker v. Carr,* 1962, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663, sets that question at rest. The action asserts violation of Federal constitutional rights and 28 U.S.C. § 1343(3) does confer jurisdiction. *See* 369 U.S. at 198–204, 82 S.Ct. 691.

### B. *The Eleventh Amendment.*

The defendant's reliance on the Eleventh Amendment is misplaced. *Ex Parte Young,* 1908, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714.

### IV. *The Merits.*

Perhaps not surprisingly, plaintiffs' counsel have not been able to cite to us any case that directly supports their complaint. We have a strong feeling that if this court were to undertake to grant to plaintiffs the relief that they seek, our action would set the sometimes canonized and frequently capitalized Founding Fathers, as well as the Framers and Supporters of the Fourteenth Amendment, spinning in their graves. To us, the picture of a Federal Judge undertaking to tell the Speaker of the Arizona House of Representatives how many Democrats, and perhaps even which Democrats, he is to appoint to the standing committees, and perhaps to each such committee, of the House is startlingly unattractive.

We find nothing in the First or Fourteenth Amendments or in 42 U.S.C. § 1983 that can justify this attempt to inject the Federal Judiciary into the internal procedures of a House of a state legislature. The principle that such procedures are for the House itself to decide is as old as the British Parliament.[2] It is embodied in the Constitution of the United States: "Each House may determine the Rules of its Proceedings . . . ." (Art. I, Sec. 5, cl. 2). It is embodied in the Constitution of Arizona: "Each house to determine rules of its proceedings" (Art. IV, Sec. 8).

### A. *First Amendment.*

Plaintiffs' reliance on the First Amendment is misplaced. The only language in it that is even remotely related to their case protects "the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."[3] We are aware that the Court has given these words a very broad meaning. Nevertheless, we see nothing in the way in which

---

2. See W. Holdsworth, History of English Law, 1924, Vol. Two, pp. 429–33; Vol. Four, pp. 174–78; Vol. Six, pp. 88–90.

   From the earliest period in its history, the English Parliament has accepted the principle that the wishes of the majority are decisive. *Id.* Vol. 2, p. 431.

3. We are unable to understand the suggestion of appellants that failure to appoint a Democrat a member of a committee somehow deprives him of freedom of speech. We cannot accept so extravagant a construction of the guaranty of freedom of speech.

the committees of the Arizona House are set up that interferes with the rights of the people of Arizona to assemble and petition. Were we among the Democratic members of that House, we might feel as much put upon—indeed, outraged—as plaintiffs do. But we would still be hard put to explain how (our) their First Amendment rights have been infringed. It stretches the language of the First Amendment beyond recognition to make it mean that an elected member of the state legislature, who so far as appears, has the usual right of a member to speak to and vote upon matters that come before the House, including the right to appear and testify before its standing committees, has had his right to assemble and petition the government infringed because the Speaker of the House has not appointed him or some of his colleagues to a committee or to certain committees. The way for him to get on committees of the House is to try to persuade the Speaker to change his practices, or to persuade the House to change the rules, or failing that (plaintiffs did try, and failed) to get together with fellow Democrats and persuade the voters to elect a Democratic majority in the next House. Running to a Federal Judge for an injunction or a declaratory judgment requiring the Speaker to put the plaintiff or his colleagues on committees is a perversion of the judicial process into a political process. We are against it.

### B. *Fourteenth Amendment.*

■ The only language of the Fourteenth Amendment that is or can be claimed to be pertinent here is the following: "nor shall any State . . . deny to any person within its jurisdiction the equal protection of the laws." Plaintiffs argue that to deny to Democratic members of the House proportional membership on standing committees is to deny them the equal protection of the laws, and is also indirectly to deny to those who voted for them the equal protection of the laws. We think that these propositions are *non sequiturs.*

So far as appears, every member of the House was chosen in an election in which the one man one vote, equal protection, rule of *Reynolds v. Sims,* 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, was fully complied with. In other words, so far as their rights to vote are concerned, the voter plaintiffs and all other voters similarly situated have had the full benefit of the protection of the Fourteenth Amendment. So have the voters who voted for candidates who were defeated. So have the candidates for whom they voted—both those who won and those who lost. In theory at least, and very often in fact, each candidate elected represents all of the people of his district—those who voted for him, those who voted against him, those who chose not to vote, those who were not eligible to vote. He does not represent just or only the voters who voted for him, or those who are members of his political party.

Unless Arizona voters differ markedly from those of other states, it is almost certain that every member of Arizona's House was put there by a mixture of voters—Republican, Democratic, and Independent, with perhaps a few members of splinter parties thrown in. It is nonsense to say that every member who ran on the Democratic ticket represents only Democrats. Moreover, to try to extend the one man one vote rule to party representation on committees is totally to disregard the rights of voters who voted for losing candidates. Did they, by voting for losers, cease to be "persons" under the Fourteenth Amendment for the purpose of transmitting their rights, as appellants seem to think that Democrats who voted for winners do by some sort of political osmosis, to the elected candidates? Or did those who voted for the winners by some similar sort of osmosis, acquire the right to assert and transmit to the winning candidates not only their own Fourteenth Amendment rights but also those of all of the voters of their district who voted for the loser? Plaintiffs' arguments treat the rights of those who voted

for the loser, as well as the rights of those who did not vote, as if they did not exist. Must we next, in the name of equal protection, weight the vote of each member in the House in proportion to the vote that he received out of the total vote in his district? Or some other way? Plaintiffs ask us to try to impose upon the Equal Protection clause a meaning that it cannot bear, a burden that it cannot carry.

Moreover, we cannot discover a manageable standard for resolving the problem. Plaintiffs say that this is easy—just require appointment to each committee of enough Democrats to give them 45% of the places, giving the Republicans the benefit of "breakage." This would produce the following results:

| Size of Committee | Republicans | Democrats | Approximate % Democratic |
|---|---|---|---|
| 15 | 9 | 6 | 40 |
| 13 | 8 | 5 | 38 |
| 11 | 7 | 4 | 36 |
| 7 | 4 | 3 | 43 |
| 6 | 4 | 2 | 33 |

It is thoughtful of the plaintiffs not to seek fractions of places. What if one member of the House runs as a socialist or a conservative and wins? He will be 1.66% of the membership. Is he entitled to a seat on a committee? Which one? Whom is he to displace—a Democrat or a Republican? In either case, why? Why shouldn't he get the benefit of breakage, which is more than one-half of one percent?

But this does not solve the basic question—who represents whom? If we accept plaintiffs' wholly unjustified assumption that Republican members represent only Republicans and Democratic members represent only Democrats, and each is entitled to represent his constituents as so defined, why do plaintiffs not seek to weight each member's committee entitlement by the number of his partisans registered to vote in his district, or actually voting in his district, or some similar measure? It is not unusual that some members, having "safe" seats, are elected by large margins, while others are chosen by very close votes. No doubt plaintiffs would respond that to attempt such calculations would be too complex and difficult. They would probably be right—which simply confirms our view that a judicially discoverable and manageable standard cannot be found.

■ This is particularly true because plaintiffs' basic assumptions are false. In a legislature, Republicans do not always and only vote with Republicans or Democrats with Democrats. Particular items of legislation frequently produce large scale crossing of party lines. Are committee appointments to be juggled and rejuggled depending upon which measure is coming before a committee? If not, is there not unequal and therefore unconstitutional representation on the committees? If so, are the adjustments to be based upon the supposed views of each member, or those of his constituents, or what? Plaintiffs' simplistic notions of representation are a poor basis for transferring decisions about committee appointments from Arizona's House of Representatives to a federal district court. From the beginning of the Republic, and long before, until now, this kind of decision has been committed to the legislative body involved, whether it be the House of Commons, one of the houses of Congress, or one of the houses of a state legislature. We are not in a position, and we do not think that the United States District Court for the District of Arizona is in a position, to make a better judgment about how the Arizona House of Representatives should go about its business than that House can make. Even if the court could, it ought not to. Those who want a change have their recourse at the polls, not in a federal court.

### C. 42 U.S.C. § 1983.

Section 1983 of Title 42, U.S.C., adds nothing to plaintiffs' case except a jurisdictional base. Plaintiffs point to no other provisions of the Constitution or the laws [of the United States] that might support their substantive claims.

### D. *The Cases.*

We turn to the cases that the plaintiffs cite. Because the district judge, in his oral

statement of reasons for granting judgment for defendant, relied upon "the Doctrine of Separation of Powers," plaintiffs cite *Baker v. Carr,* 1962, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663. As we have seen, *Baker v. Carr* holds that the doctrine does not deprive the court of jurisdiction.

The next issue is one of "justiciability," and we take it that it was in this sense that the district judge referred to the "Doctrine of Separation of Powers." In *Baker,* which dealt with legislative apportionment, the Court first noted that cases resting on the guarantee of a Republican form of government, Art. IV, Sec. 4, do not present justiciable questions. The plaintiffs do not rest their claims on that basis. The Court then proceeded to state:

> [I]n the Guaranty Clause cases and in the other "political question" cases, it is the relationship between the judiciary and the coordinate branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the "political question."

In *Elrod v. Burns,* 1976, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547, Mr. Justice Brennan, speaking for the plurality, repeated the foregoing language from his opinion for the Court in *Baker v. Carr.* In *Elrod,* separation of powers "was also raised as a ground for denying relief." Mr. Justice Brennan's reply was:

> The short answer to this argument is that the separation of powers principle, like the political question doctrine, has no applicability to the federal judiciary's relationship to the States.

Thus we cannot dispose of the case by calling the question "political," however political it may indeed be, nor by invoking the doctrine of separation of powers.

*Baker v. Carr* dealt with jurisdiction of, and justiciability of, claims by voters that malapportionment of electoral districts for members of state legislatures deprived them of equal protection, a problem quite different from the problem presented in this case. *Baker* produced *Reynolds v. Sims,* 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506, and its progeny. These cases are not in point. An individual citizen, voting for a candidate for public office, is in a very different position from an elected member of a legislative body, such as Arizona's House of Representatives. It is true that, like the elector, the member has one vote as a member of the House. Nothing in the record, however, suggests that his vote is different from that of each other member. He has no more right to have other members vote with him than an elector has to have other electors vote with him. Neither has a right to win. Each has a right to have his vote counted, with the same weight as every other vote. That, the member has. Nothing has been done to interfere with the right of Democratic members to participate in Democratic party affairs. The record affirmatively shows that they caucused, elected officers, proposed amendments to the Rules, including one seeking proportional representation on committee, and tried to persuade the House to adopt them. They were voted down, but the Federal Constitution does not give them, as a minority party, the right to win. This could be done only by giving greater weight to their votes than to those of the Republicans. Surely the Federal Constitution does not require a result so bizarre. Thus *Sweezy v. New Hampshire,* 1957, 354 U.S. 234, 77 S.Ct. 1203, 1 L.Ed.2d 1311, and *Williams v. Rhodes,* 1968, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24, upon which plaintiffs rely, are not in point.

Plaintiffs also rely on cases holding that a legislative house cannot deny a seat to one who meets the qualifications specified in the constitution and laws of the state or nation and who has been duly elected to that seat. *Bond v. Floyd,* 1966, 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (State Legislature); *Powell v. McCormack,* 1969, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (Federal House of Representatives). Nothing remotely comparable has happened here.

Nor is *Lubin v. Panish,* 1974, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702, holding unconstitutional a requirement of a filing fee to be paid by a potential candidate

because it burdened a minority party's interest in the continued availability of political opportunity, in point. The Democratic members of the House have had the advantage of political opportunity. That is how they got elected. They are now participants in a legislative process, the rules of which are adopted in the usual way—by majority vote of their House. Nonapportionment to committees deprives some of them of one form of participation in the work of the House. But they can still appear before committees; they can still know what committees are doing; they can still speak—on the floor and elsewhere; they can still try to persuade their colleagues to vote for measures that they favor; they can still work with their fellow partisans, in and out of office, to get particular bills passed and to get their party back in power.

It is true that, under the rules and the practice of the Speaker, the Republicans are favored to some extent because they are the majority party. It is true that in most American legislatures committee appointments are usually roughly proportionate to the strength of the major parties. It is true that many political scientists believe that this is the better way for legislative bodies to conduct their business. It is also true, however, that there is no authority for the proposition that it is constitutionally required.

What we have said about *Lubin, supra,* is equally applicable to *Harper v. Virginia Board of Elections,* 1966, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169, which invalidated the Virginia poll tax. *Ammond v. McGahn,* D.N.J., 1975, 390 F.Supp. 655, on which plaintiffs heavily rely, has been reversed on other grounds, 3 Cir., 1976, 532 F.2d 325. The Court of Appeals expressly reserved judgment on the merits, *id.* at 329. Moreover, ejection of a Democratic senator from the Democratic caucus, an informal, nonofficial body, is quite different from the question before us. We do not, by distinguishing the case, in any way imply that we agree with its rationale.

We are strengthened in our conviction that the judgment in this case should be affirmed by some of the language of the Court in *National League of Cities v. Usery,* 1976, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245. That case held invalid the 1974 amendments to the Fair Labor Standards Act, insofar as they interfere with the power of the states to govern in areas of traditional government functions. In so holding, the Court relied in part on the Tenth Amendment (*id.* at 842–43, 96 S.Ct. 2645). In the concluding paragraph of the opinion, the Court says:

> Congress may not exercise that [the Commerce] power so as to force directly upon the States its choices as to how essential decisions regarding the conduct of integral governmental functions are to be made. We agree that such assertions of power if unchecked, would indeed, as Mr. Justice Douglas cautioned in his dissent in *Wirtz,* allow "the National Government [to] devour the essentials of state sovereignty." 392 U.S., at 205 [88 S.Ct., at 2028], and would therefore transgress the bounds of the authority granted Congress under the Commerce Clause. *Id.* at 855, 96 S.Ct. at 2475.

It is, of course, true that in *Usery* the Court dealt with the power of Congress, while here we deal with the power of the federal courts. But the principle is the same. Indeed, if what the Court says about a Congressional enactment, to which the Supremacy Clause expressly applies, is correct, it should also apply to the power of a federal court. If fixing the wages of state employees is an essential decision regarding the conduct of integral governmental functions, so, too, is the exercise by the Arizona House of Representatives of its power to adopt rules for its procedures and the exercise by the Speaker of his authority under those rules to appoint committees.

The judgment is affirmed.