Edwin **MUNDO–RIOS, et al., Plaintiffs,**

v.

Carlos **VIZCARRONDO–IRIZARRY, et al., Defendants.**

**Civ. No. 02–2502(JAG).**

United States District Court, D. Puerto Rico.

Oct. 24, 2002.

electors by refusing to timely swear in Edwin Mundo Rios, as a State House Representative. Docket No. 15. Defendants have opposed. Docket No. 17. For the reasons explained below, plaintiffs' request is **GRANTED in PART** and **DENIED in PART.**

## I. INTRODUCTION

At the outset, the Court is relieved that the potential constitutional crisis was averted by the administration of the oath and seating of Mr. Mundo in the House of Representatives (HR), following the order of this Court, on October 8, 2002, notwithstanding the undue delay in obeying the Court's mandate.

**As will be discussed, approximately forty (40) years ago, the United States' Supreme Court, in a unanimous decision (9–0), clearly established the authority of federal courts to intervene in cases or controversies where state legislators were challenged in federal court for having abridged individual's civil and constitutional rights under 42 U.S.C. § 1983, by refusing to seat an elected state representative.** *See Bond v. Floyd,* 385 U.S. 116, 131, 87 S.Ct. 339, 347 (1966)(Chief J. Warren)(unanimous decision, 9–0)(federal district court had jurisdiction to seat a state legislator and declare that exclusion of Representatives from membership in Georgia's House of Representatives, violated right of free expression under the First Amendment). **Defendants allowed this controversy to escalate unnecessarily by delaying the administration of Mr. Mundo's oath.**

Charles A. Rodriguez, San Juan, PR, for plaintiffs.

## *OPINION AND ORDER*

DOMINGUEZ, District Judge.

Pending before the Court is plaintiffs' Request for Contempt, based on Defendants' delay in empowering plaintiff's

## II. FACTUAL AND PROCEDURAL BACKGROUND

The Court briefly restates the facts of this case. Plaintiff, Edwin Mundo, is a member of the New Progressive Party

(PNP, for its Spanish acronym). In Spring of 2002, the PNP began organizing a special election, pursuant to local law, to substitute a vacancy in Puerto Rico's House of Representatives (HR), following the sudden resignation of the Honorable Angel Cintron, holding an at large seat, and also a PNP member. Mr. Mundo was, until January 2001, a member of the HR, but lost in the elections of 2000. Mr. Mundo, and several others, decided to run in the special elections to fill said vacancy. All were duly certified as eligible candidates by Puerto Rico's Electoral Commission (CEE, for its Spanish acronym). On September 29, 2002, Mr. Mundo won the ballot for a seat in the House of Representatives of Puerto Rico, in a landslide, partisan, electoral vote. In total, approximately 110,000 eligible Puerto Rican voters participated in the elections, of which Mr. Mundo received 61,800 votes, that is 56.1% of the total electors who participated in this special election.

A few days thereafter, **on October 3, 2002,** the CEE issued the official certification, recognizing Mr. Mundo as the winner. With certification in hand, Mr. Mundo went to the HR and requested that the oath be administered, provided he had been duly certified as the winner. The defendants refused, alleging that Mr. Mundo had a criminal accusation pending in the local court. Instead, defendants filed a resolution in the HR to create a select legislative committee to ascertain whether Mr. Mundo was eligible and/or qualified to take his seat, and issue a report thereafter. No self imposed time limitation to render the report was expressed in the Resolution creating the committee. The select committee, composed of several legislators, issued an invitation to Mr. Mundo to testify before the committee, but he refused, claiming the committee was acting in violation of the Constitution. Moreover, Mr. Mundo insisted that, notwithstanding the criminal accusation against him, he is innocent of any wrongdoing, and that therefore, the HR was attempting against the constitutional principle of presumption of innocence. In any event, he advised defendants that, if found guilty and convicted, he would voluntarily resign his seat. Nevertheless, defendants refused to administer the oath, and was advised that he could not swear until the committee created had rendered its report and the House properly voted on the matter. (See House Report on Resolution 5197, Docket No. 9). In light of their refusal, this case ensued, on October 7, 2002.[1]

Mr. Mundo filed a Motion seeking a Temporary Restraining Order (TRO) together with his complaint. After examining the matter, and "because the probability of success is large and the effect on the public interest is being amply served," the Court, following the quadripartite test set forth in *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4 (1st Cir.1991), on October 7, 2002, at 10:50 p.m., issued an order granting the TRO. The Court mandated defendants to administer the oath to Mr. Mundo the next day, **"by 12:00 mid day** on October 8, 2002." Docket No. 7.[2] The Court further established a date for a hearing on the preliminary injunction. At the time the Court entered the TRO, no report had been rendered; the committee had began work on that same day, but no time limit date was set for the report to be rendered. Counsel for defendants, on the

---

1. Another case in local court was likewise filed a few hours prior thereto the same date.

2. The Court, pursuant to Fed. R. Civ. Pr. 65(b), received the attorneys for the defendants in chambers and heard arguments for over one hour prior to the submittal of the TRO for judicial determination.

night the TRO was issued, could not guarantee any HR Committee result favoring the plaintiff nor that the House in full vote would favor a recommendation to seat plaintiff.

The next day, **at 12:06 pm,** on October 8, the defendants filed a "Motion to Quash Regarding Order." Docket No. 9. In essence, defendants advised the Court of the following: first, that they insisted in not "submitting themselves to the jurisdiction of this Court"; second, that the HR would be considering and voting on the report recommending the seating of Mr. Mundo Rios, prepared and signed early on October 8, 2002, by the select committee, in a session which was to commence at 11:00 am; and lastly, they argued that "the speech and debate clause of the Commonwealth and United States Constitutions, ... [cloaked them with] absolute immunity as they are legislative action[s]. . . ." Docket No. 9. There was no evidence proffered to the Court as to a time limit for the debate on the Resolution dated October 8, 2002; the Resolution itself set no time limit for the debate, notwithstanding the Court order issued the prior date, clearly setting forth a limit to swear in Mr. Mundo Rios. (See Docket No. 9, Resolution of the House).

At 12:51 pm, Mr. Mundo filed a Motion in Contempt, advising this Court that defendants had violated the noon deadline, which had been imposed by the Court. The Court patiently waited several hours and eventually filed, at 3:33 p.m. in the Clerk's office, an order requiring defendants to appear in court at 5:00 p.m., that same day (October 8), to show cause why they should not be "severely sanctioned for a deliberate contemptuous conduct toward the federal court sitting in Puerto Rico."

Docket No. 12. Defendants obeyed this order, and appeared in Court. They explained that Mr. Mundo had been duly sworn in at approximately 3:00 pm, **on October 8, 2002.**[3] Accordingly, the Court decided to vacate the TRO and advised parties that the only then pending matters were the issues of the "attorneys fees, and the lateness of plaintiff swearing in." Docket No. 14. On October 9, 2002, Mr. Mundo filed the now pending Motion for Contempt, for delay in compliance with the Court order. Defendants have appeared in response, alleging that the matter has become moot, provided Mr. Mundo was sworn in, (albeit) at around 3:00 p.m.

## III. FEDERAL JURISDICTION TO ENTERTAIN THE SUBJECT MATTER

"At the oral argument, it was suggested that maintenance of this suit in the federal courts constitutes an attack on the sovereignty of the State of New Jersey and its independent legislative branch. *We find that any suggestion that the federal courts are without jurisdiction to consider the complaint in this action is completely without merit.* The complaint, brought under 42 U.S.C. § 1983 and its jurisdictional counterpart, 28 U.S.C. § 1343, as well as under 28 U.S.C. § 1331, alleges violation of plaintiff's constitutional rights by the State of New Jersey, the New Jersey Senate, and its members acting under color of state law. *We believe our jurisdiction to reach the merits is controlled by the action of the Supreme Court in Bond v. Floyd, 385 U.S. 116, 131, 87 S.Ct. 339, 347, 17 L.Ed.2d 235 (1966), where it held that it had jurisdiction to review whether the Georgia House or Representatives*

---

**3.** Also advised by defendants in a motion filed on that same date at 3:32 p.m. *See* Docket No. 17.

*deprived one of its elected members of federal constitutional rights by refusing to seat him because of his public statements criticizing the Vietnam war policy."* Parker v. Merlino, 646 F.2d 848, 852 (3rd Cir.1981)(Emphasis added).

The Court analyses the merits of Mr. Mundo's motion requesting sanctions for contempt, fully considering the defendants' position. Certainly, the jurisdiction of this Court to adjudicate this matter, has been called into question by defendants, and the implied suggestion has been made that this Court should have abstained.[4] The suggestion is clearly meritless. The Court explains.

In the landmark cases of *Bond v. Floyd, supra,* and *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the Supreme Court "pierced the veil" on the state legislatures' absolute authority to evaluate the qualification of its members.[5] The facts of *Bond* are extremely similar to the case at hand. In *Bond,* a duly elected State Representative of the Georgia House of Representatives was excluded by the State's House of Representative, on the basis of his remarks censuring the United States' involvement in the Vietnam War. His admission to the HR—it was said— "tended to bring discredit and disrespect on the House." *Bond,* 385 U.S. at 123, 87 S.Ct. 339. He further allegedly encour-

aged the youth, as an integral part of his stance on the Vietnam War, to disregard the selection service law by burning draft cards. *Bond,* 385 U.S. at 120–123, 87 S.Ct. 339. When he appeared at the HR to be sworn in, the clerk refused to administer the oath until the issue as to his qualification was decided. Accordingly, a special legislative committee was appointed to report on this issue.

After hearings and deliberations, the special committee's report was issued, which recommended that Bond not be sworn in. A majority vote of the HR later adopted the report's recommendation, and determined that Bond would not be allowed to take the oath of office as a member of the HR. *Id.* at 125, 87 S.Ct. 339. Bond then filed an action in a federal district court, seeking injunctive relief and declaratory judgment, under the premise that the action of Georgia's House of Representatives, violated his rights under the First Amendment of the U.S. Constitution. A Three Judge District Court was then convened, under 28 U.S.C. § 2281.[6] Even though the Three Judge Court was divided on the merits, it **unanimously** held that it had jurisdiction to decide the constitutionality of the House action because Bond had asserted substantial First Amendment rights.[7] However, on the merits, a majority of the three judges [8] held that separa-

---

**4.** As stated before, defendants have insisted that they are allegedly appearing before this Court without "submitting themselves to the jurisdiction" of this Court, and they have further alleged that the speech and debate clause "of the Commonwealth and United States Constitutions" has cloaked them with "absolute immunity." *See,* e.g., Docket No. 9.

**5.** "It used to be that the power of the legislature in regard to the qualifications of its members was absolute, with no judicial review permitted. This absolute power was pierced by the Supreme Court . . ." in *Bond* and *Powell. See Legislature of Virgin Islands v. Mapp,* 1989 WL 53841 (D.Virgin Islands).

**6.** The institution of a Three Judge Court was repealed by Public Law 94–381 of 1976.

**7.** The Court notes that in *Bond,* the State of Georgia stipulated that if plaintiff succeeded on his appeal, he would receive back salary for the term from which he was excluded. *See Bond,* 385 U.S. 116 at n. 4, 87 S.Ct. 339. In *Powell, infra,* the Supreme Court went so far as to concluding that plaintiff's claim for back salary was "viable."

**8.** Chief Circuit Judge Tuttle, the chief of the 11th Circuit, sat as a member of the Three Judge court, dissented, entered an opinion, and would have ordered the seating of Bond

tion-of-powers principles gave Georgia's legislature power to insist on qualifications in addition to those specified in the State Constitution, it could establish additional qualifications to those expressed in the state's constitution. Therefore, even though Bond met all the constitutional requisites, the legislature could still disqualify him for "not supporting" or not being "loyal" to the Constitutions of the State of Georgia and the United States (treason). Bond, of course, appealed.

■ On appeal, the Supreme Court of the United States unanimously reversed. At the outset, the Supreme Court set an important precedent by holding that federal courts have "jurisdiction to review the question of whether the action of [a State] House of Representatives deprived [a person] of [his] federal constitutional rights. . . ." *Id.* at 131, 87 S.Ct. 339. Abstention was never mentioned, nor implied. The Court then moved on to the issue of whether the disqualification of Bond violated the First Amendment, as applied to the States through the Fourteenth Amendment, and found that Bond's disqualification effectively violated his free speech rights. It is important to note that the Court reiterated a rule enunciated in *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct.

125, 5 L.Ed.2d 110 (1960), in which the Court stated: "When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. **But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.**" *Id.* at 347, 81 S.Ct. at 130 (emphasis added). Hence, *Bond* plainly stands for the age-old doctrine that State legislative branches may not invoke absolute immunity from suits in federal courts when their legislative acts violate federal constitutional rights.[9]

A few terms later, in *Powell,* the Supreme Court reviewed a determination made by the District of Columbia Circuit—which affirmed a lower federal court—and held that, although members of Congress were protected by the Speech or Debate Clause of the Constitution, the House of Representative was nonetheless without power to exclude congressman who was duly reelected by voters of his district, on the basis of the accusations or allegations that he had deceived the House authorities as to travel expenses, during the 89th Congress. Instead, the House approved a resolution prohibiting him from taking his seat, and the Speaker appointed a Select

___

based on a violation of due process in that the cause for exclusion of the elected representative was not amongst the criteria for qualifications stated in the Georgia Constitution. *See* 251 F.Supp. 333, 345–357 (N.D.Ga.1966).

9. After all, "the very essence" of federal "judicial duty" is to determine whether an act of any legislature is repugnant to the Constitution and therefore "void," for "[t]he judicial power of the United States is extended to all cases arising under the constitution." *Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 177–78, 2 L.Ed. 60 (1803). Inasmuch as defendants' allegations amount to the suggestion that this Court "must close [its] eyes on the [C]onstitution," this Court must counter in denial for this proposition was squarely re-

jected by Chief Justice Marshall in *Marbury,* when he said that this, "would subvert the very foundation of all written constitutions" and allow the legislature to do "what is expressly forbidden." *Id.* at 178. In sum, Defendants' proposition amounts to say that they may violate the federal Constitution so long as their acts are done under the guise of their legislative powers—this, notwithstanding their oath to uphold the Constitution of the United States then claim absolute immunity and demand that their acts be "closed upon" and not "be inspected by" a federal court. *Id.* at 180. But as Chief Judge Marshall said in *Marbury,* "If such be the real state of things, this is worse than solemn mockery." *Id.* at 180.

Committee to determine his eligibility.[10]

The Select Committee invited Powell to appear at a hearing, to discuss his constitutionally-required qualifications of "age, citizenship, and residency; [and] his involvement in a civil suit (in which he had been held in contempt); and matters of ... alleged official misconduct...." Powell appeared, and testified, but refused to give answers as to matters outside the constitutionally-required qualifications of "age, citizenship, and residency". *Id.* at 491, 89 S.Ct. 1944. Other hearings were later held, but Powell refused to appear inasmuch as they pertained to the issue of his "expulsion or other punishment." *Id.* Eventually, the Committee recommended that Powell be sworn in and seated as a member of the House, but that he be censured by the House, fined $40,000 and be deprived of his seniority. The House, however, determined to exclude Powell from Congress. Powell sued in federal court, alleging violations under the Art. I, section 2, cl. 1, for being inconsistent with the mandate that the members of the House shall be elected by the people of each State, and Art. I, section 2, cl. 2, which set forth the exclusive qualifications for membership. The complaint further attacked the House as a bill of attainder, and ex post facto law, and as cruel and unusual punishment. Finally, the complaint alleged that the hearing procedures adopted by the Select Committee violated the Due Process Clause of the Fifth Amendment.

Because respondents argued that the Speech or Debate Clause of the Constitution was an "absolute bar" to Powell's action, the Supreme Court began by reiterating the principle first established in *Marbury v. Madison,* 1 Cranch (5 U.S.) 137, 2 L.Ed. 60 (1803), that legislative immunity, albeit important, cannot "bar all judicial review of legislative acts." *Powell,* 395 U.S. at 503, 89 S.Ct. 1944. The Court stated that "it is the providence and duty of the judicial department to determine in cases ... whether the powers of any branch of the government, and even those of the legislature in the enactment of laws, have been exercised in conformity to the Constitution...." *Id.* at 506, 89 S.Ct. 1944 (citing *Kilbourn v. Thompson,* 103 U.S. 168, 199, 26 L.Ed. 377 (1880)).

The Court then went on to explain the critical difference between "exclusion" and "expulsion"—the first relates to the punishing of a duly-elected legislator based on acts occurred **prior** to the time when he was elected a member; the later has to do with punishing him **after** he has taken oath, a matter expressly addressed in the Constitution. *Powell,* 395 U.S. at 507–512, 89 S.Ct. 1944. Citing historical, congressional records, the Court suggested that Congress had constitutional authority to "expel" of one of its members, but not "exclude" a duly-elected member, for acts occurred prior to the time he was elected: "This is purely a legislative body and entirely unsuited for the trials of crimes.... [But the Constitution] cannot vest in Congress a jurisdiction to try a member for an offense committed before his election; for such offense a member, like any other citizen, is amenable to the courts alone." *See id.,* at 509, n. 29, 89 S.Ct. 1944. Then, the Court keenly discerned and uncovered the political dilemma the House was facing with Powell: "[h]ad the matter come up through the process of expulsion, it appears that the two-thirds vote would have

---

**10.** However, the Court notes that notwithstanding the House prohibited Adam Clayton Powell from taking his seat until the House acted on the Select Committee's report, it did provide that he should receive all the pay and allowances due a member during the period. *Powell,* 395 U.S. at 490, 89 S.Ct. 1944.

failed...." *Id.* at 511, 89 S.Ct. 1944. Because there were insufficient partisan votes to expel Powell, once sworn in, apparently the House's party majority was shrewdly trying to merge or confuse its constitutional authority to "expel" its members, for the unlawful purpose of "exclusion." But the Court rejected this approach declaring that **"exclusion and expulsion are not fungible proceedings."** *Id.* at 512, 89 S.Ct. 1944 (emphasis added).

As to the issue of subject matter jurisdiction, the Supreme Court agreed with the unanimous conclusion of the Court of Appeals that federal courts had jurisdiction over controversies of this kind. *Id.* The Court cited *Bond* approvingly, and found that cases of this nature are justiciable cases or controversies. *Id.* at 513 & n. 35, 89 S.Ct. 1944. In rejecting the constitutional argument that the House of Congress was the exclusive judge of "elections and qualifications of its own members" and the only branch empowered "to punish its members for disorderly behavior," and therefore a federal court was only authorized to "declare its lack of jurisdiction" as to this issue, the Court in *Powell* stated: "It has long been held that a suit 'arises under' the Constitution if a petitioner's claim 'will be sustained if the Constitution ... [is] given one construction and will be defeated if [it is] given another.'" *Id.* at 514, 89 S.Ct. 1944 (*citing Bell v. Hood,* 327 U.S. 678, 685, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)). Moreover, the Court in *Powell* reaffirmed the fact that "the intent of the drafters [of the Constitution] was to provide a broad jurisdictional grant to the federal courts." *Id.* at 515, 89 S.Ct. 1944.[11]

Having satisfied itself that federal courts possessed jurisdiction to adjudicate Powell's controversy, the Court addressed the merits of the case. The Court in *Powell* established an important constitutional principle regarding "the immutability of the qualifications [of a legislator] set forth in the Constitution." *Id.* at 540, 89 S.Ct. 1944. To wit, that "[t]he qualifications of the persons who may choose or be chosen ... are **defined and fixed in the Constitution,** and are **unalterable by the legislature.**" *Id.* at 539, 89 S.Ct. 1944 (emphasis added). This, following the "true principle of a republic," which is "that the people should choose whom they please to govern them." *Id.* at 540–41, 89 S.Ct. 1944 (citing Alexander Hamilton, 2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876)).

"To allow essentially [the limited power to expel] to be exercised under the guise of judging qualifications, would be to ignore Madison's warning, born out in the Wilkes case and some of Congress' own post Civil War exclusion cases, against 'vesting an improper and dangerous power in the Legislature.' Moreover, it would effectively nullify the Convention's decision to require a two-thirds vote for expulsion. Unquestionably, Congress has an interest in preserving its institutional integrity, but in most cases that interest can be sufficiently safeguarded by the exercise of its power to punish its members for disorderly behavior and, in extreme cases, to expel a member with the concurrence of two-thirds. In short, both the intention of the Framers ... and an examination of the basic principles of our democratic system persuade us that the Constitu-

---

11. The Court also upheld the broad statutory basis for its federal question jurisdiction, holding that: "[w]hile it might be inferred that Congress intended to give each House the exclusive power to decide congressional elec-

tion challenges, there is absolutely no indication ... [of the] intention to impose other restrictions on the broad grant of jurisdiction in [28 U.S.C. §] 1331." *Id.* at 516, 89 S.Ct. 1944 (footnote omitted).

tion does not vest in the Congress a discretionary power to deny membership by a majority vote."

*Powell,* 395 U.S. at 547–48, 89 S.Ct. 1944 (citation omitted).

Finally, on the suggestion that cases of this (political) nature may produce a "potentially embarrassing confrontation between coordinate branches," the Court explained: "Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility." *Id.* at 548–549, 89 S.Ct. 1944.

■ In short, the constitutional principles enunciated in *Bond* and *Powell* may be recapitulated as follows: First, federal courts possess the authority and, more importantly, the duty of interpreting the Constitution, and adjudicating cases where a plaintiff's constitutionally-protected rights have been violated, even if the violation was done under the guise of defendant's state legislative powers alleged under the equivocal assumption of absolute state legislative immunity. *See Bond,* 385 U.S. at 131, 87 S.Ct. 339. Second, the qualifications of a legislator are immutable; that is, the qualifications of persons who may be elected to office may not be altered ex post facto by a legislature, for that would constitute an impermissible attempt to purposefully confuse the legislature's limited power to "expel" a seated member, with their intent of "excluding" an duly-elected person from taking his seat, all in potential violation of his constitutional rights to due process, first amendment,

equal protection, and presumption of innocence. *Powell,* 395 U.S. at 512, 539–40, 89 S.Ct. 1944. After all, the Supreme Court in *Powell* suggested that this would amount to "vesting" the legislature with the "the trial of crimes," a power which belongs only to the executive branch and which is "entirely unsuited for" a "purely legislative body." *Id.* at n. 29. The similarities to the instant case are striking.

■ In the instant case, there is no question that Mr. Mundo was "accused," **albeit not "convicted,"** of committing a crime, **for acts committed before** he ran successfully in the election to fill a vacant seat in Puerto Rico's House of Representative. It is also undisputed that, he was duly certified by the CEE (which necessarily means he was legally "qualified") to participate in the election as a candidate, and **no challenge was ever made to his candidacy, either by the defendants, or anyone else, even though local law provides a mechanism to do so.**[12] As stated before, Mr. Mundo filed this suit after defendants refused to administer his oath, on the suggestion that he was not "qualified" to take seat in the HR, and instead determined to create a special committee which was to ascertain his qualifications. Defendants' have suggested incorrectly that this Court does not have jurisdiction to entertain this issue, on the basis of the doctrine of separation of powers.[13] The case of *Bond* holds by unanimous precedent to the contrary.

The Court further takes judicial notice of the case of *Santa Aponte v. Secretario del Senado,* 105 D.P.R. 750 (1977), where the Supreme Court of Puerto Rico held that the Constitution of Puerto Rico limits the qualifications of the Commonwealth's

---

12. See "Puerto Rico Electoral Act" of December 20, 1977, 16 L.P.R.A. § 3001 *et seq.,* see also section 4.017, 16 L.P.R.A. § 3167.

13. The Court assumes they are also implying the principles of federalism.

Representatives to the requisites of age, citizen, residence and literacy, exclusively. In *Santa*, a senator affiliated to the Popular Democratic Party (PPD, for its Spanish acronym) was not allowed to take his seat because there was, at the time running, a legally-mandated recount ordered by the closeness of the election then being held, which challenged Santa's electoral certification. At the time of the suit, the election was extremely close and the dissenting opinion implies Santa was no longer ahead. See 105 D.P.R. 750, 774–796 (Hon. Angel Martin). The Court held, however, that Mr. Santa, as Senator-elect, could be excluded only if he failed to comply with the constitutionally-required criteria. *Id.* at 763. But more importantly, **that Court held that the certification provided to candidates by the CEE created a presumption of validity and veracity, which precluded the Senate from excluding Santa.** *Id.* at 766. Mr. Santa Aponte was ordered seated notwithstanding the electoral challenge to comply with two constitutional principles: i) the adequate representation of the electors who elected him and, ii) the composition and stability of the members of the Senate. *Id.*

In this case, notwithstanding the clear Supreme Court mandate of *Santa Aponte*, defendants refused to administer oath to

Mr. Mundo, a PNP member, and a **duly-certified** winner of a special election. Defendants admit that Mr. Mundo satisfied the local constitutional requisites of age, citizen, residence and literacy. However, they obviously determined to "exclude" Mr. Mundo, based on the premise that, since criminal charges are pending against him, his admission to the legislative body could be denied ex post facto for some unknown and undetermined reason, related to said criminal charges.[14] Accordingly, the PPD majority in the HR created a special commission, to ascertain this issue. This Court finds, however, that in doing so, defendants potentially acted in contravention to the federal constitutional rights of Mr. Mundo,[15] and more importantly, they acted in clear contravention to the principles established by the Supreme Court of the United States, in *Bond* and *Powell*. Defendants further create a potential equal protection violation under the United States Constitution by refusing to apply to Edwin Mundo, a PNP minority member, the mandate of the Supreme Court of Puerto Rico in the case of *Santa Aponte*, 105 D.P.R. at 766, there applied to a PPD member. Therefore, because the Court opines the instant case presents naked questions of potential violations to the federal Constitution, it has a "virtual

**14.** Although, defendants have not argued this point, as in *Powell*, the Court rejects a priori the notion that this constitutes impermissible speculation: "their attempt to equate exclusion with expulsion would require a similar speculation that the House would have voted to expel [Mr. Mundo] had it been faced with that question." *See Powell*, 395 U.S. at 508, 89 S.Ct. 1944.

**15.** Those federal constitutional rights deemed "fundamental" are applicable to Puerto Rico. *See Harris v. Santiago Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980)(Marshall, J. dissenting); *Torres v. Puerto Rico*, 442 U.S. 465, 99 S.Ct. 2425, 61 L.Ed.2d 1 (1979)(applying Fourth Amendment protec-

tions); *Calero–Toledo v. Pearson Yacht Co.*, 416 U.S. 663, 668–69, n. 5, 94 S.Ct. 2080, 2084–2085 n. 5 (1974)(holding that Puerto Rico is subject to the Due Process Clause of either the Fifth or Fourteenth Amendments); *Examining Board v. Flores de Otero*, 426 U.S. 572, 599–601, 96 S.Ct. 2264, 2279–2281, 49 L.Ed.2d 65 (similarly holding as to equal protection guarantees). Furthermore, the presumption of innocence, although not specifically articulated in the U.S. Constitution, is a centuries-old component of an accused's constitutional rights and of a fair trial system of justice. *See Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976).

unflagging duty" to exercise jurisdiction. *Colo. River Water Conservation Dist. v. United States,* 424 U.S. 800, 817–19, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)(explaining several factors federal courts must consider when assessing the appropriateness of dismissal in the event of an exercise of concurrent jurisdiction, and emphasizing that "no one factor is necessarily determinative").

**In conclusion, this Court finds that it has jurisdiction to continue adjudicating this matter,** for there can be no question that the "absolute power" of legislatures to judge the qualification of its members "was pierced by the Supreme Court more than [thirty] years ago in ... *Bond* and ... *Powell."* [16] *See also Larsen v. Senate of Com. Pa.,* 152 F.3d 240, 248 (3rd Cir.1998) (where the Court explicitly found that federal courts—particularly the Supreme Court have previously rejected jurisdictional challenges to the federal courts adjudicating claims raised against state legislators). *See also, Davids v. Akers, supra,* (where a federal district court was held to have jurisdiction over a controversy relating to the seating of Democratic members of the Arizona state House of Representative, since the action involved a civil rights violation). Therefore, the defendants cannot suggest that this court's intervention constitutes an attack on the sovereignty of the Commonwealth of Puerto Rico and its House of Representative. *See Parker v. Merlino,* 646 F.2d 848, 852–56 (3rd Cir.1981) (where the Court summarily rejected the argument that federal courts' intervention

constituted "attack on the sovereignty of the State of New Jersey and its legislative branch")(citing *Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235). More importantly, the instant case presents naked questions of potential violations of the federal Constitution, and the Court has a "virtual unflagging duty" to exercise jurisdiction. *Colo. River Water Conservation Dist.,* 424 U.S. at 817–19, 96 S.Ct. 1236.

## IV. MERITS OF CONTEMPT

Now the Court briefly addresses the merits of plaintiff's request for sanctions. This Court has broad powers to sanction a party for contumacious conduct. *United States v. Horn,* 29 F.3d 754, 763 (1st Cir.1994)(citing 18 U.S.C. § 401 and recognizing that district courts have broad statutory powers to "punish contumacious conduct").[17] *See also Rodriguez v. IBP, Inc.,* 243 F.3d 1221, 1231 (10th Cir.2001)("A district court may exercise broad discretion in using its contempt power to assure compliance with its orders")(emphasis added; citations omitted); *Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.,* 84 F.3d 367, 370 (10th Cir.1996)(A district court may exercise broad discretion in using its contempt power to assure compliance with its orders).

Furthermore, courts generally hold that any finding of contemptuous conduct is reviewable only for "a clear showing of abuse of discretion." *See N.A. Sales Co. v. Chapman Industries Corp.,* 736 F.2d 854, 857 (2d Cir.1984); *O'Connor v. Midwest Pipe Fabrications, Inc.,* 972 F.2d 1204,

---

**16.** *Legislature of Virgin Islands v. Mapp,* 1989 WL 53841 (D.Virgin Islands).

**17.** 18 U.S.C. 401, Power of Court, provides as follows: A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—

(1). . . .

(2). . . .

(3) **Disobedience or resistance to** its lawful writ, process, **order,** rule, decree, or command.

1209 (10th Cir.1992)(This court reviews a district court's exercise of its discretion for abuse of discretion); *Reliance Ins. Co. v. Mast Constr. Co.,* 84 F.3d 372, 375–76 (10th Cir.1996)("Abuse of discretion is established if the district court's adjudication of the contempt proceedings is based upon error of law or a clearly erroneous finding of fact").

In the instant case, the Court issued an order against defendants mandating them to administer oath to Mr. Mundo, **"by 12:00 mid day** on October 8, 2002." Docket No. 7. On October 8, 2002, *i.e.,* the next day, **at 12:06 pm,** the defendants filed a "Motion to Quash Regarding Order." Docket No. 9. The strong resistance to this Court's order is palpable and discernible in their motion. In their motion, defendants advised the Court, *inter alia,* that they were not "submitting themselves to the jurisdiction" of this Court; and that the special House committee evaluating the "qualifications" of Mr. Mundo had rendered a report concluding that Mr. Mundo "must be sworn in"; however, defendants explained that the HR would be considering and voting the report prepared by the select committee in a session which was to commence at 11:00 am, and "[a]t the conclusion of the consideration of the report . . . the House shall take final action on said report." Docket No. 9 (emphasis added). They **did not** specify the duration of the session, **nor did they indicate specifically whether the House's Secretary, a defendant in this case, would comply with the order by 12:00 pm,** as the order provided, albeit they did advise the Court that the **"defendants shall comply fully with their obligations in law, as provided by . . . this Honorable Court."** Docket No. 9 (emphasis added). The legislative debate and the vote could technically take days. The Defendants further failed to even request any extension of time.

Nevertheless, the defendants failed to comply with the order, inasmuch it is undisputed that Mr. Mundo was not sworn in **until approximately 3:00 pm,** and not noon, as the Court ordered. This, notwithstanding the unequivocal statements made through their attorneys, that they would **"comply fully with their obligations in law, as provided by . . . this Honorable Court."** (Docket no. 9).

Defendants now argue that the matter is moot, and they even pretend to quote the undersigned in support of their defense, claiming that the Court held in the hearing on contempt, on October 8, 2002, that the issue of contempt for noncompliance with the order was moot. Again, they have erred. The Court was careful to explain that since defendants had administered Mr. Mundo's oath that day, Mr. Mundo's motion for a temporary restraining order had become moot, and that the contempt for not swearing in was moot, but not the conduct for lateness in complying with a Court order. In other words, the equitable, preliminary injunctive relief issue had finalized. But as the minutes of the hearing clearly show, the Court advised parties that the issues of the "attorneys fees, **and the lateness of plaintiff swearing in"** would remain pending for final adjudication. *See* Docket No. 14. The Court noted that the contempt request filed by Plaintiff was for the outright total refusal to swear in Mr. Mundo by twelve noon. No motion had then been filed as to the delay in complying with a Court order.

■ In light of these circumstances, the Court finds that defendants acted in haste, and contumaciously, potentially warranting civil contempt. Reiterated contempt after further warnings of the Court could lead to a criminal federal law violation. *See* 18 U.S.C. § 401(3). Accordingly, continued non-compliance potentially warranted disciplining defendants for their conduct, ei-

ther by fine or other enhanced discipline. Nevertheless, the Court deems that notwithstanding it possess jurisdiction and authority to sanction defendants in their personal capacity, the Court shall judiciously stay its hand instead.

The Court is surprised and disappointed that defendants openly disobeyed or resisted this Court's order, and is baffled by the striking irony of the situation. Defendants were allegedly concerned that Mr. Mundo's admission to the HR would bring discredit and disrespect on the House, provided he has been **criminally accused.** But with their conduct, **defendants themselves risked incurring in civil and/or criminal contempt, and, thus, pursuant to the their own expressions, the Court assumes they also risked bringing discredit and disrespect on the House.**

The HR debate, as to the exclusion of Mr. Mundo Rios was sterile since its very inception. This Court recapitulates and explains:

1. As to the issue relating to the jurisdiction of the Federal Court, federal courts have authority to enter into potential federal constitutional violations of State House of Representatives' members. *Bond v. Floyd,* 385 U.S. 116, 87 S.Ct. 339, 17 L.Ed.2d 235 (1966); *Parker v. Merlino,* 646 F.2d 848 (3rd Cir.1981); *Larsen v. State of Com. Pa.,* 152 F.3d 240 (3rd Cir. 1998); *Davids v. Akers,* 549 F.2d 120 (9th Cir.1977).

2. Pursuant to the mandate of *Bond v. Floyd,* a state legislature, in exercising state's interest to refuse to seat an elected member, cannot "circumvent a federally protected right" (free speech under First Amendment cannot be circumvented and this district court adds neither can the presumption of innocence).

3. Pursuant to the mandate of *Powell v. McCormack,* the Legislature cannot add

or alter qualification criterias, ex post facto to an election, to those previously established by the Constitution or laws, because due process of the law is affected. Further, the legislators are impeded from evaluating potential criminal violations of the elected members because said conduct contravenes the separation of legislative v. executive constitutionally delegated powers. **"But the Constitution cannot vest in Congress a jurisdiction to try a member for an offense committed before his election; for such offense a member, like any other citizen, is amenable to the courts alone."** (Emphasis ours). *See Powell,* 395 U.S., at 509, n. 29, 89 S.Ct. 1944.

■ 4. The Legislature cannot refuse to seat an elected member, who has been provided an electoral certification of election, even if there are irregularities alleged in the election pursuant to the mandate of *Santa Aponte v. Secretario del Senado, supra.* The PPD majority, refusing to apply the clearly state Supreme Court mandate to a PNP minority member, as Edwin Mundo Rios **or any other minority member of any party,** constitutes a potential equal treatment violation under the Fifth Amendment to the United States Constitution.

Hence, a debate by House of Representatives, as to the exclusion of Edwin Mundo, based upon potential criminal not adjudicated conduct and/or because of irregularities in the election once a certificate is issued, constitutes, in this case, an unproductive and ineffective debate, producing merely delay affecting the constitutional rights of the empowered electors and of Mr. Mundo Rios. The Court is baffled by the alleged lack of knowledge of the defendants, until the day *after* the Court rendered its TRO, as to the limits of their discretion in seating co-members, as set forth by the Supreme Court of the

United States in the cases of Adam Clayton Powell and Julian Bond, and by the Supreme Court of Puerto Rico, in the case of Jesus Santa Aponte. These waters were clearly chartered by Chief Judge Earl Warren (*Bond* and *Powell*), and by Chief Judge Jose Trias Monge (*Santa Aponte*), many decades ago.[18] This District Court is not navigating in unchartered waters.

Compliance of the law (which includes Court orders) is indispensable for our constitutional system to be workable. The Court is mindful that discrepancy (expressed as well as unexpressed) is unavoidable and constitutionally protected in our society. But compliance with the law is necessary if our freedoms and our democracy are to prevail. Otherwise, democracy turns into anarchy. Hostility towards other branches of government, be it local or federal, is thus unacceptable and should be avoided. However, "our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility." *Powell v. McCormack, supra,* at 548–549, 89 S.Ct. 1944.

The Court eschews from further escalating the constitutional confrontation because, notwithstanding the unnecessary delay, the electors have been constitutionally empowered as Mr. Mundo Rios is today a member of the House of Representatives.[19] The Court, given the clear judicial doctrines stated herein emanating mostly from the Supreme Court of the United States, therefore forewarns defendants for their calculated, risky, and misguided delay tactic. We are of the opinion that confrontation between the federal judiciary and a state legislative branch is to be avoided and continued confrontation is totally unproductive given the current legislative status of Mr. Mundo Rios. Notwithstanding, "when a state [legislative] exercises power [in seating a new member] . . . circumvents a federally protected right", the federal courts, as the ultimate protector of the Constitution, must exercise its jurisdiction. *Bond v. Floyd, supra; Powell v. McCormack, supra; Larsen v. Senate of Com. Pa., supra; Parker v. Merlino, supra; Davids v. Akers, supra.* (Federal cases wherein the district court was held to have jurisdiction over the seating of a member of a federal or state House of Representative).

The instant case, however, must continue. Plaintiff is authorized to withdraw the security deposit, since said party has been duly sworn in, pursuant to defendants' theory, voluntarily following a vote by the House of Representative. Hence, his request for return of bond is **GRANTED.** (See Docket No. 19). As to the attorney's fees requested, see Docket No. 20, the matter is **PREMATURE,** and hence, **DENIED,** because, although lawyer's fees are recuperable to a prevailing party in a civil rights violation under 18 U.S.C. 1983, see

---

**18.** The Resolution of the House of Representatives, dated October 8, 2002, clearly admits at p. 11, that a pending criminal case cannot bar the swearing in of an elected member because that reason is not an established criteria under the Constitution of the Commonwealth of Puerto Rico.

**19.** The Court invites the parties to settle the remaining matters in this case. Since the Court rapidly responded to the injunction request a few hours after filing, and Mr. Mundo Rios was sworn in the very next day, albeit late, the empowered electors may have suffered but nominal damages. The Court further invites the parties, as was maturely followed in *Powell*, to agree on a reasonable back pay date as to Mr. Mundo Rios. (see fn. 7, 10, *infra*).

42 U.S.C. § 1988 [20], the Court has not issued, to this date, a final judgment. Plaintiff is reminded that the fees that may be recuperated pursuant to law, are related strictly to work performed **in this federal civil rights case,** and pursuant to a "lodestar" per-hour basis, as illustrated in *Coutin v. Young & Rubicam Puerto Rico, Inc.,* 124 F.3d 331, 337–342 (1st Cir.1997). (Lodestar method illustrated in a Title VII discrimination complaint).

### V. CONCLUSION

The Court therefore herein ends the contempt proceedings. We shall notwithstanding not hesitate to comply with our "unflagging duty" pursuant to *Colo. River Water Conservation v. United States,* 424 U.S. at 817–819, 96 S.Ct. 1236, to exercise jurisdiction over cases and controversies involving federal constitutional issues, even if our understanding varies from the "construction given ... by another branch." *Powell,* 395 U.S. at 547–548, 89 S.Ct. 1944.

**IT IS SO ORDERED.**

---

**20.** The civil rights attorneys' fees law legislatively recalled the case of *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975), holding that since The Civil Rights Act did not provide for lawyers' fees, the American Rule prevailed and, hence, the Court could not grant attorneys' fees.